# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-IA-00768-SCT

*BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ, P.C. AND WILLIAM N. REED*

*v.*

*SAM SEAY*

DATE OF JUDGMENT:                      04/14/2008
TRIAL JUDGE:                           HON. TOMIE T. GREEN
COURT FROM WHICH APPEALED:             HINDS COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANTS:              MICHAEL W. ULMER
                                       JAMES JOSEPH CRONGEYER, JR.
                                       JAMES MATTHEW TYRONE
                                       JOHN P. SNEED
                                       REUBEN V. ANDERSON
                                       FRED L. BANKS, JR.
ATTORNEYS FOR APPELLEE:                PHILLIP J. BROOKINS
                                       JOHN LEONARD WALKER, JR.
NATURE OF THE CASE:                    CIVIL - OTHER
DISPOSITION:                           REVERSED AND REMANDED - 06/10/2010
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

## CONSOLIDATED WITH

## NO. 2008-IA-00999-SCT

*WILLIAM N. REED AND BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ, P.C.*

*v.*

*SAM SEAY*

DATE OF JUDGMENT:                      05/27/2008
TRIAL JUDGE:                           HON. TOMIE T. GREEN
COURT FROM WHICH APPEALED:             HINDS COUNTY CIRCUIT COURT

ATTORNEYS FOR APPELLANTS:      JOHN P. SNEED
                               REX M. SHANNON, III
                               REUBEN V. ANDERSON
                               FRED L. BANKS, JR.
ATTORNEYS FOR APPELLEE:         PHILLIP J. BROOKINS
                               JOHN LEONARD WALKER, JR.
NATURE OF THE CASE:            CIVIL - OTHER
DISPOSITION:                   AFFIRMED IN PART; REVERSED AND
                               REMANDED IN PART - 06/10/2010
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     Sam Seay and William Reed began a lifelong friendship at age eight.  In January 2003, following termination from his employment with BancorpSouth, Sam alleges that Reed, an attorney and then-president and chief operating officer ("COO") of Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C. ("Baker Donelson"), undertook legal representation of Sam in the ensuing conflict.  Reed acknowledges that Sam "asked me to look at some specific [legal] issues . . . ."  In late October or early November 2003, Reed participated in an extramarital affair with Sam's then-wife, Rebecca Seay.  In January 2004, Sam filed a complaint against BancorpSouth using other counsel.  While Sam concedes that Reed was never counsel of record in the case, he maintains that Reed agreed to advise him "behind the scenes . . . ."  According to Sam, Reed provided legal advice through October 26, 2004.  Reed's affair with Rebecca ended between August and October 2004.

¶2.     The date when Sam learned of the affair is disputed.  In deposition testimony, Sam swears the date was August 2, 2004.  Subsequently, Sam went to Reed's office and threatened suit if his demand for $3 million from Reed and Baker Donelson was not met

2

within two weeks.  There is no evidence in the record that anyone at Baker Donelson other than Reed was aware of the affair prior to Sam's demand in November 2004.  When the demand was not met, Sam filed suit in the Circuit Court of Hinds County, Mississippi.  The complaint included separate counts of negligent infliction of emotional distress, alienation of affections, and breach of fiduciary duty as to Reed, and counts of breach of fiduciary duty, empowerment, negligent failure to supervise, and vicarious liability as to Baker Donelson.  Subsequently, the circuit court entered orders denying Reed's Motion for Partial Summary Judgment and Baker Donelson's Motion for Summary Judgment.  From those rulings proceeds part of this consolidated interlocutory appeal.  The other parts pertain to two admissibility rulings of the circuit court, both adverse to Reed; and the circuit court's denial of Reed and Baker Donelson's Motion to Compel Physical and Mental Examination.

**FACTS**

¶3.    Sam and Reed were lifelong friends.[1]  According to Sam, Reed was one of his "go-to guys that, day or night, whenever your ox was in the ditch, that's who you called."  Sam noted that he "had no reservation . . . discussing anything with [Reed,]" and that, likewise, Reed had "always been very . . . open with me . . . ."

---

[1]Sam and Reed grew up together, were fraternity brothers at Ole Miss, and Reed was a pallbearer at the funeral for Sam's mother.  When Sam married Rebecca on July 20, 1984, Reed and his wife attended.

3

¶4.     Sam was a vice-president and director of Pittman, Seay & Turner Insurance and Bonding, Inc.   On October 10, 2000, Sam and his partners sold their agency to BancorpSouth, and Sam entered into a five-year employment agreement with BancorpSouth.[2]

¶5.     In September 2001, Sam was diagnosed with "situational depression," which he related to his work environment at BancorpSouth.  Sam testified that "the doctors prescribed several antidepressants that all had sexual side effects, making me impotent and gave me erectile dysfunction."  In an effort to self-medicate, Sam began abusing alcohol and was subsequently admitted to the Betty Ford Clinic from February 2002 to April 2002.[3]

¶6.     Sam's employment issues with BancorpSouth persisted and, in early January 2003, Sam testified that Reed told him "that, '[w]e,' meaning Baker Donelson, 'will make [BancorpSouth's] life miserable if they terminate you.'"  Specifically, Sam testified that:

> [i]t was [Reed], myself and his wife and my wife, and we had discussed . . . the case over dinner.  And then I talked to him that night and . . . he said, "We'll handle this for you and we will make BancorpSouth's life miserable.  I will guarantee you that.  And it will be at no charge."[4]

---

[2]The agreement provided for an annual salary of $185,000 and also contained antipiracy and noncompetition covenants.

[3]Sam's admission to the Betty Ford Clinic was at the insistence of Reed, among others.  During the period of this leave of absence from BancorpSouth, Sam alleges Reed was representing him.

[4]Prior to being affiliated with Baker Donelson, Reed had provided the following free legal services for Sam: (1) the execution of gifts from Sam's mother to Sam and his sister in 1987; (2) a power of attorney for Sam's mother in 1989; and (3) in 1991, he represented Sam and reviewed a noncompete contract of one of Sam's former employees.

According to Sam, this offer of free services was "a result of the reciprocal relationship we had had for years, of all the business I had sent over there . . . and had cultivated his career over the years."[5]

¶7.    On January 13, 2003, Sam was declared totally and permanently disabled by the Social Security Administration.  That same day, Sam was terminated by BancorpSouth.  Sam's severance package included one year's salary.  According to Sam, his disability status "had to do with mental illness, nothing to do with alcohol."

¶8.    Following his termination, Sam understood that Reed commenced "official representation" of him on January 17, 2003.  Reed admits that Sam "asked me to look at some specific [legal] issues . . . ."  Regarding his January 17, 2003, memo to Sam, Reed stated that he:

> looked at . . . [Sam's] contract, . . . the scope of the non-compete, it was pretty broad. . . .  And . . . I said, "You don't want to be involved in any kind of dispute over this while they're paying you a severance.  But if you eventually get into litigation with them and they contend that you violated your non-compete, a material breach of the contract by them might be a defense to that."

Subsequently, Reed "opened a pro bono file" on the "non-compete anti-piracy provision[s]" in Seay's employment agreement with BancorpSouth.  On March 4, 2003, Reed sent a letter on Baker Donelson letterhead to counsel for BancorpSouth, which provided that "*[w]e represent Sam Seay*[,]" and that "[w]hile Mr. Seay has complied and will continue to comply

---

[5]Sam's affidavit provides that "[a]fter [Reed] became an attorney, I used my best efforts to refer prospective clients to him and his law firm."  In 2002, Reed had a "client development lunch" with Sam.  According to Ben Adams, the chief executive officer of Baker Donelson, "I understand that [Sam] did refer clients to [Reed].  I can't tell you to what extent they resulted in meaningful client relationships . . . , but I do know there was a prior relationship and Sam did refer clients to [Reed]."

with the applicable terms of his contract with your institution, your characterizations of the restrictions imposed by that contract are incorrect. Any future communications regarding the contract should be directed to my attention." (Emphasis added.) Reed acknowledged that he subsequently e-mailed counsel for BancorpSouth "essentially [stating], 'Sam Seay has been trying to speak to someone about his benefits including COBRA. Would someone please call him.'" Additionally, Reed admitted that Sam:

> brought some medical records to our office to be faxed to someone. My secretary faxed them, and for some period of time [the medical records] were in his file because he couldn't keep up with anything. He kept asking for copies of the same materials. So [Reed's secretary] stuck them in the file. I didn't read them . . . . And I don't recall having any financial information.

¶9. In October 2003, Reed and Rebecca engaged in what Reed referred to as "alcohol-related kissing" in Rosemary Beach, Florida. It is undisputed that Reed and Rebecca commenced an affair in either late October or early November 2003, and it ended between August and October 2004.[6] During the course of the affair, Reed denied having any conversations with Rebecca about matters involving Sam's legal dispute with BancorpSouth.[7] According to Reed, the affair was "purely personal."

¶10. On December 9, 2003, Reed e-mailed counsel for BancorpSouth, as "Sam was apparently owed an expense reimbursement check and had not gotten it and asked me to

---

[6]According to Sam, Rebecca admitted to him that Reed had made unwanted sexual advances toward her on October 18, 2003; that Reed and Rebecca had sexual relations at the Seay's home on December 25, 2003, while Sam was "asleep under medication[;]" and that Reed and Rebecca had sexual relations in the Seays' hotel room in Dallas on January 1, 2004.

[7]This point is corroborated by Rebecca. Likewise, according to Rebecca, she does not know of anything that Baker Donelson did to assist Reed in pursuing and engaging in an affair with her.

check on it." On January 6, 2004, Reed e-mailed the human resources department of counsel for BancorpSouth that "'*[m]y client* [Sam] has been attempting to speak to you about several important insurance and tax issues. I would appreciate your calling him . . . .'" (Emphasis added.) Reed also acknowledged that he "met with [Sam's attorney, John Griffin Jones] at some point before he filed the lawsuit on behalf of [Sam] and told him that I didn't believe [Sam] had a claim." Reed maintains that he did not represent Sam in the BancorpSouth lawsuit. According to Reed, "I told Sam from day one that if [it] ended up in litigation with BancorpSouth that we would not be involved[,]" and "that's why he hired another lawyer, in addition to the fact that I told him that he didn't have a claim."

¶11.    On January 12, 2004, Jones filed Seay's complaint against BancorpSouth. The complaint included counts of breach of contract; tortious or bad-faith breach of contract; wrongful discharge; termination in violation of public policy; misrepresentation and equitable estoppel; intentional infliction of emotional distress; and breach of fiduciary duties and a nonderivative shareholder's claim.[8] While Sam concedes that Reed was never counsel of record in the BancorpSouth case, he added that Reed had "said he could not keep a high profile in the case, but he could sit behind the scenes and advise us as part of the team."[9] In

---

[8]According to the complaint, "[a]s a direct and proximate result of the breach of contractual obligations and misconduct of [BancorpSouth] . . . , [Sam] began suffering headaches and episodes of major depression, first diagnosed by [Sam's] family physician in September, 2001."

[9]According to Sam, Reed informed him that, while he would not sue BancorpSouth, "he would . . . continue to advise me and work with . . . whoever I selected as the person to file the papers against the bank, that he would be operating as a counsel, even offered to sit at the . . . table with us . . . in front of the judge." Reed denied telling Sam that he would discretely counsel and advise him.

that capacity, Sam stated that Reed had "reviewed the deposition schedule that we planned and totally changed it up[,]" insisting that "the lower officers ought to be questioned first. Mr. Jones had them scheduled to be questioned last."[10] In September or October 2004, Reed attended Sam's deposition. Sam maintained that Reed "was serving as my attorney[,]" and that during a break in the deposition, Reed "told me to keep my answers . . . briefer . . . ." According to Reed, however, he went to the deposition only "because [Sam] asked me to go as a friend and I sat there and did not participate." Reed maintained that he "did not speak and . . . did not enter an appearance."[11] According to Sam, Reed continued to provide him with legal advice until October 26, 2004.

¶12. The date when Sam discovered the affair is disputed. Reed testified that Sam "told me he learned of it in December of 2003." On October 15, 2004, Sam confronted Rebecca about the affair, along with close friends. During this secretly videotaped confrontation,[12]

---

[10] Reed did not recall communicating with Jones about the order in which depositions of the BancorpSouth representatives should be taken.

[11] Reed provided that "[o]n the initial copy of th[e] [deposition] transcript I was not listed as making an appearance for [Sam]. Sam . . . went back and changed that and had it added after even he admits knowing about the affair."

Sam acknowledged that he requested a change to the appearance page in February or March 2005 because "Reed was there representing me. He had made several phone calls the night before, coaching me for the deposition and . . . he also discussed things during the break, coaching me during the deposition. I thought it was only right that his name should be included."

[12] According to Sam, he met with an attorney on August 4, 2004, after learning of the affair, and she "advised me to arrange a confrontation with friends present and to have the confrontation/intervention videotaped and recorded."

A transcript of the confrontation is contained within the supplemental record. On appeal, the admissibility of the DVD recording is at issue. *See* Issue III, *infra*.

8

Sam claimed that he had known about the affair for a year.[13] Moreover, Sam stated that he previously had warned Reed to end the affair.

¶13. Sam now states that he learned of the affair on August 2, 2004. Robert Saums, an employee of Security & Investigative Support Services, Inc. ("S&I"),[14] testified that on August 2, 2004, Sam:

> asked S&I to conduct a computer search for email on a . . . laptop computer that he indicated had been operated by [Rebecca]. He wanted to see if we could retrieve email written by and to [Rebecca] so that he could gain insight into his marriage. He wanted to know what aspects of their marital relationship [Rebecca] might be discussing with friends.

This search led to discovery of a letter entitled "My Darling Bill." Saums testified that "[w]hen I showed this letter to [Sam], he was visibly shaken and almost broke into tears. He seemed to have been caught totally off guard by this letter." According to Sam's psychiatrist, Dr. Mark McLain of the Mississippi Neuropsychiatric Clinic, PLLC, Sam reported his discovery of the affair on August 4, 2004.

¶14. On November 12, 2004, Sam entered Reed's office and demanded $3 million from him and Baker Donelson within two weeks or the firm's executive committee would be notified, according to Sam, to "discuss that [Reed], in his role and his scope of employment of Baker Donelson and president and [COO], had used his information as my attorney to seduce my wife and destroy my marriage and my life." That day, Adams and Sam Blair, general counsel for Baker Donelson, were apprised of the situation. There is no evidence

---

[13]According to Sam, he was lying and stated this only "to get more truthful answers from [Rebecca]."

[14]According to Saums, Sam retained S&I's services in late July 2004 for surveillance of Rebecca.

9

that anyone at Baker Donelson, other than Reed, was aware of the affair prior to Sam's demand on November 12, 2004. We are left with only Sam's allegations that "I think using the resources of Baker Donelson's time and his office as president, [Baker Donelson] w[as] very supportive of the affair."

¶15. A December 29, 2004, letter from Blair to Sam provided "[w]e do not have an active file on your behalf, *Sam P. Seay v. BancorpSouth, et al*. In fact, [Reed] and [Baker Donelson] declined to represent you and declined to file the lawsuit that is currently pending. You have other counsel that represents you in that referenced litigation." The letter added, "[p]lease do not take [Reed's] attempts to assist you preliminarily with your employment dispute as [Reed's] and the firm's representation of you in the litigation matter . . . ."

¶16. On May 27, 2005, Sam filed suit against Reed and Baker Donelson. As to Reed, the complaint alleged counts of negligent infliction of emotional distress; alienation of affections;[15] and breach of fiduciary duty. Regarding Baker Donelson, the complaint alleged counts of breach of fiduciary duty;[16] empowerment; negligent failure to supervise, manage, or control; and vicarious liability. Sam alleged that, by virtue of the actions of Reed and

_____

[15]This count specifically alleged that Reed had "engaged in an ongoing *secret and covert* sexual affair with [Rebecca] over a period of time." (Emphasis added.)

[16]The breach-of-fiduciary-duty counts against Reed and Baker Donelson alleged that "personal and intimate information" regarding Sam's "health, financial and legal affairs" were used "in [Reed and Baker Donelson's] attorney-client and fiduciary relationships with [Sam]" to "facilitate the seduction of [Rebecca]."

According to Sam, the purported "personal and intimate information" was that he "went into much greater detail about the impotence and the effect of the drugs with [Reed] than I did with [Rebecca]." In an affidavit, Sam claims that Reed utilized information "concerning my financial condition . . . which was pertinent to my legal claims against BancorpSouth and relating to my eligibility for disability[,]" in seducing Rebecca.

10

Baker Donelson, he was "deprived of the aid, support, protection, fellowship, comfort, company, society, services and the happiness [he] otherwise would have received from his wife[17] .... Further, [he] has suffered great humiliation, dishonor, disgrace and distress of mind ...."

¶17. In June 2005, Reed voluntarily resigned from his position as president and COO of Baker Donelson, although he remained an employee. Sam alleged that Baker Donelson took no formal disciplinary action against Reed.[18]

¶18. On October 11, 2005, Sam filed for divorce, which subsequently was granted on the ground of uncondoned adultery by Rebecca.

¶19. Subsequently, Reed filed a "Motion to Compel Discovery" of, *inter alia*, the DVD recording of the October 15, 2004, confrontation.[19] On January 24, 2007, the circuit court ordered Sam to produce a copy of the DVD recording for *in camera* review, along with a privilege log. In the subsequently filed privilege log, Sam claimed a work-product privilege for the recording.

---

[17]Until September 2001, Sam stated that he and Rebecca had a "very active sex [life] ...." Furthermore, while his impotence, of which he acknowledged Rebecca was aware, admittedly had an adverse effect on their relationship, Sam maintained that "I enjoyed a supportive and beneficial marriage to [Rebecca] up until" October or November 2003.

Contrastingly, Rebecca states that there was no sexual intimacy in the marriage beginning in 1999, and that she had multiple discussions with others about divorcing Sam in the years prior to 2003. According to Reed, Rebecca "had been talking about divorcing [Sam] for four or five years . . . to anyone who would listen."

[18]According to Adams, Baker Donelson reduced Reed's bonus "in response to the hassle, expense and distraction that this threatened lawsuit . . . created."

[19]Regarding the October 15, 2004, confrontation, *see* ¶ 12 *supra*.

11

¶20.   Thereafter, Reed and Baker Donelson, pursuant to Mississippi Rule of Civil Procedure 35, filed a "Motion to Compel Physical and Mental Examination."  According to the motion:

> 1. [Sam's] complaint . . . seeks to recover damages for alleged "permanent, serious and severe mental and psychological injuries and resulting physical injuries" which he attributes to . . . Reed's relationship with Rebecca . . . and, in essence, vicariously to Baker Donelson.
>
> . . .
>
> 2.  In September 2005, [Sam] was deposed and claimed to have sustained injuries such as depression, anxiety, and migraines as a result of . . . Reed's relationship with Rebecca . . . .  However, [Sam] also testified that he has sought treatment for similar injuries and other injuries in 2003 and 2004 resulting from his previous employment and a car accident, which are both in either litigation or legal negotiations.[20]
>
> . . .
>
> Defendants should be entitled to a medical examination of [Sam] as to both the cause and extent of the alleged injuries which he has placed into controversy in this case.

Sam opposed this motion, asserting that Baker Donelson and Reed had failed to show "good cause," instead offering only "boiler plate allegations[,]" and that all of Sam's medical records had been retained by them, such that they were "fully aware of [Sam's] pre-existing mental and physical conditions and the physical and mental conditions caused by the acts and/or omissions of defendants herein."[21]

---

[20]In an April 3, 2007, deposition, Sam testified that he had three separate lawsuits pending: the BancorpSouth suit; the alienation-of-affections suit; and an automobile-accident claim.

[21]Reed and Baker Donelson countered that "[t]he fact that defendants have obtained [Sam's] medical records is of no import.  If that were the case, no defendant would ever be permitted to conduct a Rule 35 examination . . . ."

¶21.    Later, Baker Donelson filed its Motion for Summary Judgment.  Relying upon

***Children's Medical Group v. Phillips***, 940 So. 2d 931 (Miss. 2006), Baker Donelson pleaded

that:

> it defies reason for [Sam] to argue that Reed's affair was within the scope of
> his employment and in any way furthered the business interest of Baker
> Donelson.  Under Mississippi law, claims against an employer arising solely
> out of an employee's affair . . . must fail as a matter of law.  Mr. Reed's affair
> with a long-time friend, not a co-worker, and not at work, was neither within
> the scope of his employment, nor was it in furtherance of any of Baker
> Donelson's business interests.

Reed subsequently filed a Motion for Partial Summary Judgment as to Sam's claims for

alienation of affections and breach of fiduciary duty.  Regarding the breach-of-fiduciary-duty

claim, Reed maintained that "[a]s a matter of law, the scope of the duties owed by an attorney

to his client is defined and limited by the scope of the legal representation, and does not

embrace purely personal aspects of the parties' lives."

¶22.    Thereafter, counsel for Reed notified counsel for Sam that a "Dear John" letter had

been discovered while "copying the Chancery Court file related to the divorce proceedings

between Sam and Rebecca . . . ."  Recognizing that Sam might assert privilege with respect

to the letter,[22] counsel for Reed sealed the subject letter and forwarded it to the circuit court.

However, counsel for Reed added that:

> [i]f the document [Sam] created was not transmitted by him to his attorney, it
> is plainly not privileged.  We assume that to be the case since you have not
> identified the document on a privilege log.  Nor is there any assertion by [Sam]
> in the chancery court file claiming that the document is privileged.  On the
> other hand, even if the document is what would otherwise be a confidential

---

[22]According to the letter from counsel for Reed, "[w]e can only presume that the
intended recipient/addressee of the ["Dear John"] letter . . . was [attorney] John Walker."

13

communication between client and attorney, the document "as represented" strongly supports the conclusion that [Sam's] claims in this lawsuit are fraudulent,[23] . . . ; consequently, Miss. R. Evid. 502(d)(1) holds that the letter is not privileged.

Thereafter, Baker Donelson filed a "Motion for In Camera Review and Determination of Discoverability," and Reed filed a "Motion to Determine Discoverability and to Compel Production of the Document," regarding the "Dear John" letter. According to Baker Donelson's motion, "either the attorney-client privilege is inapplicable or the crime/fraud exception prevents application of the privilege."

¶23. On April 16, 2008, the circuit court entered an "Order Denying Defendant William Reed's Motion for Partial Summary Judgment" and an "Order Denying Defendant Baker Donelson, et al. Motion for Summary Judgment,"[24] both without opinion.

¶24. Baker Donelson then filed its petition for interlocutory appeal,[25] presenting the following question:

> [w]ith Mississippi Code Section 79-10-67 and *Children's Medical Group* as legal guideposts, can a professional corporation law firm be liable for the sexual conduct of one of its lawyers where such conduct was outside the scope of that lawyer's employment, was not in furtherance of the firm's business, and the firm had no knowledge of the relationship?

---

[23]Specifically, the undated letter reveals that Sam "suspected the affair from late 2003[,] . . . [and] confirmed it on August 3, 2004."

[24]According to Baker Donelson, "before denying [its] motion for summary judgment, the trial court refused to hear oral argument on the motion . . . ."

[25]Baker Donelson's petition noted that this Court previously had denied its petition for interlocutory appeal of the circuit court's denial of its Rule 12(b)(6) motion to dismiss. According to Baker Donelson, that "denial took place before the Court rendered its opinion in *Children's Medical Group* . . . , which Baker Donelson believes is dispositive of the instant action."

14

¶25. On May 28, 2008, the circuit court entered three separate orders, each adverse to Reed and Baker Donelson. The Order as to Video and Audio Recordings Reviewed In Camera concluded that, because the October 15, 2004, DVD recording had been "previously provided to defendants . . . Reed's motion to compel its production is moot; however, the [c]ourt finds that [the DVD recording] is protected by the attorney work product doctrine and not admissible at trial . . . ." Regarding the "Dear John" letter, the "Order on Defendants Baker Donelson and William Reed's Motion to Determine Discoverability and to Compel Production of Document," provided that since it "was acknowledged by all counsel during the hearing that all . . . are familiar with the contents of the letter . . . the issues of the letter's discoverability and production are moot." The order added that "the subject letter is a privileged communication from [Sam] to his attorney and therefore not admissible as evidence or for use as impeachment and defendants' motions are denied." Finally, the Order Denying Defendants' Motion to Compel Physical and Mental Examination of Plaintiff concluded that:

> defendants have failed to show good cause for [Sam] to undergo examinations by the physician and expert chosen by defendants; defendants offered no evidence that the depositions of [Sam] and his treating physician and the production of [Sam's] medical records are inadequate or insufficient to show [Sam's] physical and mental status.

¶26. On July 31, 2008, this Court entered an order in Case No. 2008-IA-00768-SCT granting Baker Donelson's petition for interlocutory appeal, as well as the Limited Joinder in Petition for Interlocutory Appeal filed by Reed as to the order denying his Motion for Partial Summary Judgment. On October 6, 2008, this Court entered an order in Case No. 2008-IA-00999-SCT granting Reed's petition for interlocutory appeal, as well as Baker

15

Donelson's joinder therein, of the three separate circuit court orders of May 28, 2008. This

Court has since consolidated the interlocutory appeals.

## ISSUES

¶27.    In Case No. 2008-IA-00768-SCT, this Court will consider:

(1) Whether the circuit court erred in denying Reed's Motion for Partial Summary Judgment as to Sam's claim for breach of fiduciary duty.[26]
(2) Whether the circuit court erred in denying Baker Donelson's Motion for Summary Judgment.

In Case No. 2008-IA-00999-SCT, this Court will consider:

(3) Whether the circuit court abused its discretion in ruling that the October 15, 2004, DVD recording was protected "attorney work product" and was inadmissible at trial.
(4) Whether the circuit court abused its discretion in ruling that the "Dear John" letter was protected by the attorney-client privilege and was inadmissible at trial.
(5) Whether the circuit court abused its discretion in denying the Motion to Compel Physical and Mental Examination.

### CASE NO. 2008-IA-00768-SCT

### STANDARD OF REVIEW

¶28.    This Court reviews the circuit court's denial of summary judgment under a de novo

standard of review. *See* ***Miller v. R.B. Wall Co., Inc.***, 970 So. 2d 127, 130 (Miss. 2007).

Summary judgment:

is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c). The burden of

---

[26]On appeal, Reed "acknowledges that [Sam] has stated legally cognizable claims against him for alienation [of affections] and infliction of emotional distress which are not susceptible to interlocutory review."

16

demonstrating that there are no genuine issues of material fact is upon the movant, and the non-moving party must be given the benefit of every reasonable doubt. [***Moss v. Batesville Casket Co., Inc.***, 935 So. 2d 393, 398 (Miss. 2006)]. "Issues of fact . . . are present where one party swears to one version of the matter in issue and another says the opposite." *Id*. (quoting ***Tucker v. Hinds County***, 558 So. 2d 869, 872 (Miss. 1990)).

***Miller***, 970 So. 2d at 130.

## ANALYSIS

I.     **Whether the circuit court erred in denying Reed's Motion for Partial Summary Judgment as to Sam's claim for breach of fiduciary duty.**

¶29.   This Court has stated that:

[a] fiduciary duty must exist before a breach of the duty can occur. "Fiduciary relationship" is a very broad term embracing both technical fiduciary relations and those informal relations which exist wherever one person trusts in or relies upon another.[27]  Black's Law Dictionary 564 (5th ed. 1979).  A fiduciary relationship may arise in a legal, moral, domestic, or personal context, where there appears "on the one side an overmastering influence or, on the other, weakness, dependence, or trust, justifiably reposed." ***Miner v. Bertasi***, 530 So. 2d 168, 170 (Miss. 1998); ***Matter of Estate of Haney***, 516 So. 2d 1359 (Miss. 1987).

***Lowery***, 592 So. 2d at 83.  In the case *sub judice*, Sam's breach-of-fiduciary-duty claims are specifically predicated upon the existence of an attorney-client relationship. *See* footnote 16, *supra*.

¶30.   An attorney-client relationship exists when:

(1) A person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and

---

[27]"[A] fiduciary relationship need not be created by contract; it may arise from an informal relationship where both parties understand that a special trust and confidence has been reposed." ***Lowery v. Guar. Bank and Trust Co.***, 592 So. 2d 79, 84 (Miss. 1991).

(2)(a) The lawyer manifests to the person consent to do so, or (b) fails to manifest lack of consent to do so, knowing that the person reasonably relies on the lawyer to provide the services, or (c) a tribunal with power to do so appoints the lawyer to provide the services.

*Singleton v. Stegall*, 580 So. 2d 1242, 1244 n.2 (Miss. 1991) (citation omitted). As such, fee payment by the client to the attorney is not required. *See id*. at 1244.

¶31. Based upon our review of the specific facts presented, we are of the opinion that a professional relationship arose when the relationship evolved "from a personal, ordinary type of relationship to that of attorney-client[,]" for intervals of time.[28] *Lowery v. Smith*, 543 So. 2d 1155, 1160 (Miss. 1989). As lifelong friends, Reed occasionally had provided Sam with free legal services over the years. Following Sam's termination, Reed "opened a pro bono file," repeatedly referred to Sam as his client in correspondence with BancorpSouth, allegedly advised Sam and Jones, and attended Sam's deposition in September or October 2004. Thus, the professional relationship coexisted with the personal relationship for these intervals of time. Giving Sam "the benefit of every reasonable doubt[,]" *Miller*, 970 So. 2d at 130, this Court concludes that, based on the undisputed facts presented, an attorney-client relationship existed between Sam and Reed for that period, just as during prior intervals, as a matter of law. Thus, Reed owed Sam a fiduciary duty.

¶32. Sam asserts that a genuine issue of material fact exists regarding a breach of fiduciary duty by Reed, based upon, *inter alia*, "Reed's admissions of contemplating and maintaining a contemporaneous romantic and sexual relationship with [Rebecca] without disclosing the

---

[28]This Court is careful to note that the existence of a professional, attorney-client relationship is fact-specific. For example, the mere response to a question at a social function does not create such a relationship.

relationship and without immediately terminating the attorney-client relationship with [Sam]

. . . ." Specifically, according to Sam:

> [t]he evidence supports the inescapable inference that at some point in time there was an intersection . . . of Reed's knowledge of his own conflict of self interest and lustful desires to pursue a relationship with [Rebecca] and Reed's functioning as the attorney for [Sam] and as President/COO of Baker Donelson . . . . Once the first such intersection . . . occurred, both Reed and Baker Donelson[29] were on notice to avoid and disclose the conflict of interests.

Sam maintains that such disclosure was avoided, in part, so as not "to risk loss of [Sam] as a source of business."

¶33.   Reed responds that "the general rule . . . , absent unusual circumstances, [is that] the scope of an attorney's fiduciary duty to his or her client does not exceed the scope of the legal representation." Reed maintains that "some material relationship between an attorney's alleged tort and the alleged legal representation must exist for professional liability . . . to attach." According to Reed:

> the affair was wholly unrelated to any limited attorney-client relationship that may have existed between Reed and [Sam] and was far outside the scope of alleged legal representation involving [Sam's] employment claim.[30] Moreover, the undisputed evidence, contrary to [Sam's] conclusory claim, is

---

[29]Given the absence of any evidence in the record that anyone at Baker Donelson, other than Reed, was aware of the affair prior to November 12, 2004, and the fact that Sam's complaint alludes to the affair as being "secret and covert," this Court finds the extension of this argument to Baker Donelson disingenuous. *See* Issue II, *infra*.

[30]Reed asserts that:

[t]o the extent [he] acted at all as [Sam's] attorney in 2003 and 2004, it was solely in connection with matters incidental to BancorpSouth's termination of [Sam's] employment, such as handling post-termination insurance issues and providing advice and communicating with [Sam's] former employer on the scope of a restrictive covenant in [Sam's] employment contract.

that Reed did not breach any client confidences, nor did he use any confidential information to seduce [Rebecca].

To hold otherwise would, according to Reed, "subject attorneys to liability on 'breach of fiduciary duty' claims in every instance in which an attorney, wholly apart from his or her professional relationship with his or her client, allegedly committed a tort against a person who also happened to be a client."

¶34.  "The relationship of attorney and client is one of special trust and confidence.  The law requires that all dealings between them shall be characterized by the utmost fairness and good faith on the part of the attorney."  *Lowery*, 543 So. 2d at 1161 (quoting *Gwin v. Fountain*, 159 Miss. 619, 126 So. 18 (1930)).  An attorney-client relationship imposes the following duties, "(a) the duty of care, (b) the duty of loyalty, and (c) duties provided by contract."  *Singleton*, 580 So. 2d at 1244.  The duty of loyalty:

> is fiduciary in nature.  In the present context its breach may take one of two forms.  The first involves situations in which the attorney obtains an unfair personal advantage, such as acquiring property from a client; the second involves situations in which the attorney or other clients have interests adverse to the client in question. We have recently defined the lawyer's duty of loyalty to include a duty to:
>
>> safeguard the client's confidences and property, avoid conflicting interests that might impair the representation, and not employ adversely to the clients powers conferred by the client-lawyer relationship.
>
> [*Singleton*, 580 So. 2d at 1245].

*Tyson v. Moore*, 613 So. 2d 817, 823 (Miss. 1992).

¶35.  This Court is unpersuaded by Sam's assertion that Reed failed to safeguard confidential information regarding Sam's impotence, and instead utilized such information

20

to "facilitate the seduction of [Rebecca]." First, this Court sees no genuine issue of material fact regarding the claim of exclusive confidentiality of such information, as Sam admitted that Rebecca was aware of his impotence prior to the affair. Second, the pre-existing, non-legal relationship existing between Sam and Reed, and finally the absence of a claim of impotence in the BancorpSouth complaint,[31] leads us to conclude that even were this Court to assume a confidential disclosure, it was unrelated to the representation undertaken and, thus, outside the attorney-client scope of this "commingled" relationship. *Lowery*, 543 So. 2d at 1160. Likewise, this Court is unpersuaded by Sam's argument that Reed utilized information "concerning my financial condition . . . which was pertinent to my legal claims against BancorpSouth and relating to my eligibility for disability[,]" in seducing Rebecca. Even when considering a motion for summary judgment, "[a] conclusory, self-serving affidavit, unsupported by material facts relevant to the proposition at issue, is insufficient . . . ." *Dalton v. Cellular South, Inc.*, 20 So. 3d 1227, 1233 (Miss. 2009).

¶36. This Court has stated that "a lawyer has a duty to inform his client of all matters of reasonable importance related to the representation or arising therefrom." *Tyson*, 613 So. 2d at 827. *See also* *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 159 (Tex. 2004) (quoting *Rankin v. Naftalis*, 557 S.W.2d 940, 944 (Tex. 1977)) ("[g]enerally, a lawyer's fiduciary duties to a client, although extremely important, 'exten[d] only to dealings within the scope of the underlying relationship of the parties.'"). No material facts have been presented to support that the subject affair was in any way "related to the representation or

---

[31]As Baker Donelson contends, Sam's "impotence – and the extent thereof – was wholly irrelevant to his contractual claims against BancorpSouth."

21

arising therefrom." **Tyson**, 613 So. 2d at 827. As no genuine issue of material fact exists on the issue of whether an adulterous affair between Reed and Rebecca constituted a breach of the fiduciary duty Reed owed to Sam, this Court concludes that the circuit court erred in denying partial summary judgment to Reed as to Sam's claim of breach of fiduciary duty.

**II.** **Whether the circuit court erred in denying Baker Donelson's Motion for Summary Judgment.**

### *Vicarious liability*

¶37. Mississippi Code Section 79-10-63(2) provides that "[t]he relationship between a domestic or foreign professional corporation and the client or patient for whom its employee is rendering professional services is the same as that between the client or patient and the employee." Miss. Code Ann. § 79-10-63(2) (Rev. 2009). Mississippi Code Section 79-10-67(2) adds that "[a] domestic or foreign professional corporation whose employees perform professional services *within the scope of their employment or of their apparent authority to act for the corporation* is liable to the same extent as its employees." Miss. Code Ann. § 79-10-67(2) (Rev. 2009) (emphasis added).

¶38. According to Baker Donelson, "it cannot be seriously contended that the consensual affair (or solicitation of that affair) between Reed and [Rebecca] – who had been friends for more [than] thirty years – was within the scope of Reed's employment or within the scope of his 'apparent authority' to act for Baker Donelson." Baker Donelson maintains that even:

> [a]ssuming, *arguendo*, that Reed breached his duty of loyalty to [Sam] by using information "related to the representation" to seduce [Rebecca] – a contention that Baker Donelson vigorously denies – Reed's breach of his duty was motivated by purely personal reasons and not in anyway related to his employment or the business of Baker Donelson.

22

Not only was Reed's affair "the quintessential example of an activity that is for purely personal benefit and outside the scope of employment[,]" but also, the affair "was unknown to anyone at Baker Donelson." In sum, Baker Donelson argues that:

> [s]ince Reed's affair and alleged breach of loyalty to [Sam] were purely for his own purposes, outside the scope of his employment, and Baker Donelson received no benefit whatsoever from his actions, Mississippi common law and Mississippi Code Section 79-10-67 preclude any claim of vicarious liability against Baker Donelson for Reed's alleged breach of fiduciary duty.

According to Baker Donelson, if Sam's position is adopted, "any professional corporation would be liable for the wrongful acts of its professionals, regardless of whether those wrongs had anything to do with the professionals' employment or corporate function."

¶39. Sam admits that Reed's affair with Rebecca was not "motivated by a desire to benefit Baker Donelson[,]" and that Baker Donelson did not "gai[n] some corporate benefit" therefrom. Sam merely presents the argument that:

> [a]ssuming *arguendo* that notice of Reed's misconduct would generally be required to be given to Reed's superior, [Adams], before Baker Donelson had a duty to exercise fiduciary responsibilities concerning Reed's conflict of interests and failure to honestly disclose and avoid such conflict, the evidence shows that such earlier notice would have been unavailing.

*Scope of employment*

¶40. "[S]ome actions are so clearly beyond an employee's course and scope of employment that they cannot form the basis for a claim of vicarious liability, as a matter of law." ***Children's Medical Group***, 940 So. 2d at 935. *See also **Jackson v. Righter***, 891 P.2d 1387, 1391 (Utah 1995) ("where the employee's conduct is so clearly outside the scope of employment that reasonable minds cannot differ, the issue may properly be decided as a matter of law").

23

¶41.    Regarding the scope of employment, this Court has stated that:

[u]nder Section 228 of the Restatement (Second) of Agency:

(1) Conduct of a servant is within the scope of employment if, but only if:

    (a) it is of the kind he is employed to perform;
    (b) it occurs substantially within the authorized time and space limits;
    (c) it is actuated, at least in part, by a purpose to serve the master, *and*
    (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

(2) Conduct of a servant is *not* within the scope of employment if it is *different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master*.

*Children's Medical Group*, 940 So. 2d at 935 (quoting Restatement (Second) of Agency § 228 (1958)) (emphasis added). "If an employee 'deviates or departs from his work to accomplish some purpose of his own not connected with his employment – goes on a 'frolic of his own' – the relation of master and servant is temporarily suspended' . . . ." *Children's Medical Group*, 940 So. 2d at 935 (quoting *Seedkem S., Inc. v. Lee*, 391 So. 2d 990, 995 (Miss. 1980)).

¶42.    In *Children's Medical Group*, this Court noted that "[o]ther jurisdictions have specifically found that an employee's affair *with a coworker* is beyond the course and scope of employment." *Children's Medical Group*, 940 So. 2d at 936 (citing *Mercier v. Daniels*, 533 S.E.2d 877, 881 (N.C. App. 2000); *Jackson*, 891 P.2d at 1390) (emphasis added). This Court held that "[i]t defies reason to argue that engaging in an affair at work or during working hours in any way furthered the business interests of CMG or enhanced the medical care of CMG's pediatric patients." *Children's Medical Group*, 940 So. 2d at 936. In

24

*Jackson*, the Utah Supreme Court stated that "Mr. Righter was not hired to perform acts of a sexual nature on, or make romantic overtures toward, an employee under his supervision." *Jackson*, 891 P.2d at 1391.

¶43.   Given this Court's earlier conclusion that the subject affair was not in any way "related to the representation or arising therefrom[,]" *see* ¶ 36 *supra* (quoting *Tyson*, 613 So. 2d at 827), along with Sam's admission that the affair was not "motivated by a desire to benefit Baker Donelson" and the absence of any evidence that anyone at Baker Donelson other than Reed, was aware of the "secret and covert" affair prior to Sam's demand on November 12, 2004, this Court concludes that this is the type of frolic "so clearly beyond an employee's course and scope of employment that [it] cannot form the basis for a claim of vicarious liability, as a matter of law." ***Children's Medical Group***, 940 So. 2d at 935.

*Empowerment*

¶44.   To "empower" is defined as "[t]o invest with legal power: authorize." Webster's II New College Dictionary 369 (1995). *See also* Black's Law Dictionary 618 (4th ed. 1968) (defining "empower" as "[a] grant of authority rather than a command of its exercise"). Based upon these definitions of empowerment, it is more likely a consideration within the "scope-of-employment" inquiry than a separate consideration altogether. Moreover, Baker Donelson notes that "there is no cause of action under Mississippi law known as 'empowerment.'" Sam provides no citation to the contrary. Therefore, this Court ends its "empowerment" inquiry here. *See **In re Adoption of Minor Child***, 931 So. 2d 566, 578 (Miss. 2006) ("an appellant's failure to cite any legal authority to support [his] argument will procedurally bar that issue from being considered on appeal").

25

### *Negligent supervision*

¶45. Under Mississippi law, "employers do not have a duty to supervise their employees when the employees are off-duty or not working. . . . Moreover, an employer's duty to supervise does not include a duty to uncover his employees' *concealed, clandestine, personal activities*." ***Tichenor v. Roman Catholic Church of the Diocese of New Orleans***, 32 F.3d 953, 960 (5th Cir. 1994) (emphasis added). *See also* ***Williams v. U.S. Fid. & Guar. Co.***, 854 F.2d 106, 109 (5th Cir. 1988) ("[t]he Restatement (2d) of Torts § 317 narrowly limits an employer's duty to control a servant's conduct outside the scope and place of employment to instances in which the servant is 'using a chattel of the master.' The Mississippi legislature and courts have not suggested a broader compass.").

¶46. According to Baker Donelson, "since Reed's covert sexual conduct was outside the scope of his employment and purely for his own benefit, Baker Donelson had no legal 'duty to supervise,' which is a *sine qua non* of a negligent supervision claim." This Court agrees. Sam acknowledged that the affair was "secret and covert," and that Baker Donelson gained no "corporate benefit" therefrom. This "concealed, clandestine, persona[l] activit[y,]" *Tichenor*, 32 F.3d at 960, is the type which Baker Donelson had no duty to supervise, such that this Court concludes the circuit court erred in denying summary judgment to Baker Donelson on Sam's claim of negligent supervision.

### *Direct breach of fiduciary duty*

¶47. Sam's direct-breach-of-fiduciary-duty claim against Baker Donelson is based upon the law firm's refusal to apologize for Reed's actions, failure to formally discipline Reed, and act of hiring a private investigator to examine Sam's claims, following Sam's demand of

26

payment. As to Sam's claims regarding alleged failure to apologize or formally discipline Reed, Sam provided no authority to support his assertion that such actions give rise to a cognizable claim of breach of fiduciary duty. Therefore, this Court will not give further consideration to such claims. *See In re Adoption of Minor Child*, 931 So. 2d at 578.

¶48. Regarding its hiring of a private investigator, Baker Donelson contends that it "was completely justified under the Rules of Professional Conduct to defend itself against [Sam's] threatened lawsuit[,]" insofar as Sam's demand of $3 million "represented a repudiation of any trust he had reposed in Reed. Thus, at that time, any attorney-client relationship that may have existed was effectively severed." Moreover, Baker Donelson notes that Sam's complaint "does not aver any post-knowledge misconduct on the part of Baker Donelson. Similarly, [Sam's] prayer for relief only seeks damages for the harm allegedly caused to him by the solicitation of the affair and the loss of his spouse."

¶49. The Comment to Mississippi Rule of Professional Conduct 1.6 provides, in part, that:

> [w]here a legal claim or disciplinary charge alleges . . . misconduct of the lawyer involving representation of the client, the lawyer may respond to the extent that lawyer reasonably believes necessary to establish a defense. . . . Such a charge can arise in a civil, criminal, disciplinary or other proceeding and can be based on a wrong allegedly committed by the lawyer against the client . . . .

Miss. R. Prof'l Conduct 1.6 cmt. This Court concludes that all defendants are legally entitled to defend themselves. Baker Donelson is no exception. Additionally, none of Sam's claimed damages purport to relate to conduct arising on or after his demand on November 12, 2004, the initial date when Baker Donelson was apprised of the "secret and covert" affair.

27

Accordingly, this Court concludes that the circuit court erred in denying summary judgment to Baker Donelson on Sam's claim of direct breach of fiduciary duty.

*CASE NO. 2008-IA-00999-SCT*

**STANDARD OF REVIEW**

¶50. This Court has stated that it:

reviews the trial court's admissibility of evidence under the abuse of discretion standard. . . . Furthermore, this Court will affirm the trial court's ruling "'[u]nless we can safely say that the trial court abused its judicial discretion in allowing or disallowing evidence so as to prejudice a party in a civil case . . . .'" [***Ellis v. State***, 934 So. 2d 1000, 1004 (Miss. 2006)] (quoting ***Jones v. State***, 918 So. 2d 1220, 1223 (Miss. 2005)).

***Turner v. State***, 3 So. 3d 742, 744 (Miss. 2009).

**ANALYSIS**

¶51. Preliminarily, Sam argues that:

[t]he orders from which appeal is taken were the subject of at least two (2) separate hearings in the trial court but the record here contains "no stenographic report or transcript of all or part of the evidence or proceedings." M.R.A.P. 10(c). Nor does the record contain a statement of the proceedings made in compliance to either Rule 10(c), (d) or (e). Under these circumstances, the Supreme Court will "presume that the decisions of the lower courts are correct . . . [and] affirm." ***Oakwood Homes Corp. v. Randall***, 824 So. 2d 1292, 1293-94 (Miss. 2002).

Alternatively, as to the October 15, 2004, DVD recording transcript and the "Dear John" letter, Sam contends that this Court has not been presented with properly authenticated documents for purposes of appellate review.[32]

---

[32]Regarding the October 15, 2004, DVD recording transcript, Sam maintains that "the record before this [C]ourt does not include the video recording . . . reviewed in camera by the trial court[,]" but instead contains only an "unauthenticated transcript" of "the audio portion of the video/audio reviewed in camera by the trial judge." As to the "Dear John"

28

¶52.    In response, Reed asserts that "[i]nstead of arguing to uphold the three separate rulings

. . . on the merits . . . , [Sam] resorts to attempting to undermine the sufficiency of the

appellate record certified by the Circuit Clerk, which he, together with appellants, jointly

submitted to this Court."  According to Reed, the "Joint Supplemental Record on Appeal,"

which was "file[d] with this Court on June 22, 2009" and "certified by the Hinds County

Circuit Court on June 3, 2009 in compliance with MRAP 10(e)[,]" included both "the

transcript of the subject videotape" and the "Dear John" letter.  As such, Reed argues that,

pursuant to *Norwood v. In re Extension of Boundaries of City of Itta Bena*, 788 So. 2d 747

(Miss. 2001), Sam has waived his "right to dispute the sufficiency of the record in this regard

. . . ."[33]  Regarding authentication of the October 15, 2004, DVD recording transcript, Reed

maintains that the document is "self-authenticating," pursuant to Mississippi Rule of

Evidence 902(8), as "it was certified by Kelly D. Brentz, 'Court Reporter and Notary

Public.'" As to authentication of the "Dear John" letter, Reed contends that "[t]he distinctive

---

letter, Sam contends that Reed "substituted a document for the 'lost' document reviewed and
placed under seal by the trial court without confirmation and authorization by the trial court
or by this [C]ourt" such that "there is no 'Dear John' letter before this [C]ourt for its review."

[33]Regarding the October 15, 2004, DVD recording transcript, Reed adds that:

three attributes of this case place it squarely outside the scope of MRAP
10(b)(2): (1) the issue of the subject videotape's admissibility was never
before the trial court; (2) Reed does not claim as the basis for his appeal
anything that allegedly occurred or did not occur during any hearing; and (3)
*the Order appealed from – agreed as to form by both parties – memorializes
the trial court's rationale in any event.*

(Emphasis added.)

characteristics of the . . . letter . . . establish its authenticity pursuant to MRE 901(b)(4) . . . ."

¶53. "[T]he burden is on the appellant to demonstrate why the lower court was in error[,]" and "we presume that the decisions of the lower courts are correct . . . ." *Oakwood Homes*, 824 So. 2d at 1294 (citing *Robinson v. State*, 345 So. 2d 1044, 1045 (Miss. 1977)). *See also Kirk v. Koch*, 607 So. 2d 1220, 1223 (Miss. 1992) (quoting *Vinson v. Johnson*, 493 So. 2d 947, 949 (Miss. 1986)) ("[i]n the absence of anything in the record appearing to the contrary, this Court will presume the trial court acted properly, and if evidence was necessary, that court heard sufficient evidence to support the judgment"). Mississippi Rule of Appellate Procedure 10(b)(2) provides, in pertinent part, that "if the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant shall include in the record a transcript of all evidence relevant to such finding or conclusion."[34] Miss. R. App. P. 10(b)(2). However, this Court has also stated that:

> Rule 10(a) provides "[t]he parties shall designate the [content of the] record." While Rule 10(b)(2) does require an appellant to provide a proper designation to allow the reviewing court to resolve the issues, an appellee has the opportunity to supplement the appellant's designation if the appellee feels that it is deficient, and should not then be allowed to complain if he fails to do so.

*Norwood*, 788 So. 2d at 752.

¶54. As to the issue surrounding the October 15, 2004, DVD recording transcript, this Court finds that the rationale of the circuit court in its *sua sponte* admissibility determination

---

[34]In the event that no transcript is available, "the appellant may prepare a statement of the evidence or proceedings from the best available means, including recollection." Miss. R. App. P. 10(c).

is stated in the "Order as to Video and Audio Recordings Reviewed In Camera" (i.e., the DVD recording "is protected by the attorney work product doctrine . . . .").[35] Regarding the issue pertaining to the "Dear John" letter, this Court likewise finds that the rationale behind the circuit court's admissibility determination is memorialized in the "Order of Defendants Baker Donelson and William Reed's Motion to Determine Discoverability and to Compel Production of Document" (i.e., the attorney-client privilege attached to the letter).[36]

### III. Whether the circuit court abused its discretion in ruling that the October 15, 2004, DVD recording was protected "attorney work product" and was inadmissible at trial.

¶55.    The "Order as to Video and Audio Recordings Reviewed In Camera" of the circuit court determined that Reed's "Motion to Compel Discovery" was moot and then, *sua sponte*, concluded that the subject DVD recording "is protected by the attorney work product doctrine and not admissible at trial . . . ."

¶56.    "The work product doctrine[37] protects an attorney's thoughts, mental impressions, strategies and analysis from discovery by opposing counsel." ***Hewes v. Langston***, 853 So.

---

[35]Regarding authentication of the transcript, this Court finds that certification by the court reporter was sufficient. *See* Miss. R. Evid. 902(8) ("[e]xtrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following: . . . (8) *Acknowledged Documents*. Documents accompanied by a certificate of acknowledgment executed in the manner provided by law by a notary public or other officer authorized by law to take acknowledgments."); ***In re Michaels Stores, Inc.***, 2004 WL 2851782 at *2 n. 2 (N.D. Tex. Dec. 10, 2004) ("the Court concludes that the court reporter's certificate attached to the transcripts establishes their authenticity").

[36]This Court is unpersuaded by Sam's authentication argument, as only a prima facie showing of authenticity is required for purposes of admissibility. *See* ***Young v. Guild***, 7 So. 3d 251, 262 (Miss. 2009).

[37]*See* Miss. R. Civ. P. 26(b)(1) & (3).

2d 1237, 1245 (Miss. 2003) (citing ***Hickman v. Taylor***, 329 U.S. 495, 510-11, 67 S. Ct. 385, 393, 91 L. Ed. 451 (1947)). This doctrine:

> "does not exist to protect a confidential relationship but to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of an opponent." [***Shields v. Sturm, Ruger & Co.***, 864 F.2d 379, 382 (5th Cir. 1989)]. Without this . . . , "[i]nefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial." ***Hickman***, 329 U.S. at 511 . . . .

***Hewes***, 853 So. 2d at 1245. As stated by Justice Rehnquist in his concurring opinion in ***United States v. Nobles***, 422 U.S. 225, 95 S. Ct. 2160, 45 L. Ed. 2d 141 (1975):

> [s]ince ***Hickman*** . . . , Congress, the cases, and the commentators have uniformly continued to *view* the *"work product" doctrine* solely as *a limitation on pretrial discovery and not* as *a qualified evidentiary privilege*. In 1970, Congress became involved with the problem for the first time in the civil area. It did so solely by accepting a proposed amendment to Fed. Rule Civ. Proc. 26, which incorporated much of what the Court held in ***Hickman*** . . . with respect to pretrial discovery. . . . [The Rule does not] limi[t] the power of the trial court to order production as evidence of *prior statements of witnesses who have testified at trial*.

***Nobles***, 422 U.S. at 246 (Rehnquist, J., concurring) (emphasis added). *See also* ***Shaw v. Wuttke***, 137 N.W.2d 649, 653 (Wis. 1965) ("the immunity of the attorney's work product in respect to a written statement ceases to exist when the person making the statement is placed on the stand as a witness at the trial. By becoming a witness the person subjects himself to the risks of impeachment and the attorney has had the benefit of his work product.").

¶57. Preliminarily, this Court examines the "work-product" claim of the subject DVD recording. While Sam provided deposition testimony that an attorney had advised him to tape-record the confrontation, this Court is unpersuaded that the actual DVD recording of the

subsequent confrontation represents "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Miss. R. Civ. P. 26(b)(3). Furthermore, this Court notes that the "work-product" doctrine pertains to pretrial discovery, not admissibility, such that the circuit court abused its discretion in predicating its admissibility determination thereon.[38] *See* Miss. R. Civ. P. 26(b)(1) & (3); *Nobles*, 422 U.S. at 246 (Rehnquist, J., concurring).

¶58.    This Court concludes that the circuit court's admissibility determination was in error. The admissibility of the subject DVD recording is to be determined at trial absent any consideration of the "attorney work product" privilege.

¶59.    In sum, the inapplicability of the "work-product" doctrine to the subject DVD recording; inapplicability of the "work-product" doctrine to admissibility; and obviation of the "work-product" doctrine with respect to secret tape-recordings all cause this Court to conclude that the circuit court abused its discretion, and thus erred, in ruling *sua sponte* that the subject DVD recording was inadmissible.

---

[38]Additionally, with respect to secret tape-recording, one federal district court has stated that:

> *[b]y surreptitiously tape recording the statements of co-workers, plaintiff has vitiated the qualified protection of Rule 26(b)(3).* ["]Without . . . production, plaintiff unilaterally maintains the ability to use the secretly recorded statements for discovery purposes and for impeachment purposes at trial. Fundamental fairness requires that the defense be afforded the opportunity, if [defendant] so desires, to use the statements [for the same purposes]."

*Robertson v. Nat'l R.R. Passenger Corp.*, 1999 WL 199093, at *1 (E.D. La. April 8, 1999) (quoting *Pfeifer v. State Farm Ins. Co.*, 1997 WL 276085, at *3 (E.D. La. May 22, 1997)) (emphasis added). This would also eradicate any Rule 26(b)(3) protection afforded to the admittedly secretly-recorded confrontation.

**IV. Whether the circuit court abused its discretion in ruling that the "Dear John" letter was protected by the attorney-client privilege and was inadmissible at trial.**

¶60.    The Order on Defendants Baker Donelson and William Reed's Motion to Determine Discoverability and to Compel Production of Document of the circuit court deemed "issues of the letter's discoverability and production . . . moot."  The order then added, *sua sponte*, that the attorney-client privilege attached to the letter, such that it was "not admissible as evidence or for use as impeachment . . . ."

¶61.    Mississippi Rule of Evidence 502(b) provides, in pertinent part, that "[a] client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential[39] communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between himself . . . and his lawyer . . . ."  Miss. R. Evid. 502(b).  According to this Court:

> "[t]he attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." **Upjohn Co. v. United States**, 449 U.S. 383, 389, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981). "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby to promote broader public interests in the observance of law and administration of justice." **Id**. at 389 . . . . "That purpose, of course, requires that clients be free to make full disclosure to their attorneys." **United States v. Zolin**, 491 U.S. 554, 562, 109 S. Ct. 2619, 105 L. Ed. 2d 469 (1989).
>
> . . .

---

[39]Mississippi Rule of Evidence 502(a)(5) provides that "[a] communication is 'confidential' if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication." Miss. R. Evid. 502(a)(5).

This Court has interpreted the scope of the attorney-client privilege under Mississippi law broadly, stating:

> the privilege relates to and covers all information regarding the client *received* by the attorney in his professional capacity and in the course of his representation of the client. Included are communications made by the client to the attorney and by the attorney to the client. In that sense it is a two-way street.

> ***Barnes v. State***, 460 So. 2d 126, 131 (Miss. 1984) (emphasis added). . . . "[I]f a communication between a lawyer and client would facilitate the rendition of legal services or advice, the communication is privileged." [***Dunn v. State Farm Fire & Cas. Co.***, 927 F.2d 869, 875 (5th Cir. 1991)].

***Hewes***, 853 So. 2d at 1244 (emphasis in original). The burden of proof rests with the party asserting the attorney-client privilege. *See **United States v. Harrelson***, 754 F.2d 1153, 1167 (5th Cir. 1985). At oral argument, counsel for Sam acknowledged that he did not receive the subject letter. Therefore, this Court has not been presented evidence that the letter, not received by counsel, constituted a privileged communication to which the attorney-client privilege applies.

¶62. Moreover, in light of the fact that the circuit court's inadmissibility ruling as to the October 15, 2004, DVD recording was in error, *see* Issue III, *supra*, and given that the "Dear John" letter states that Sam "suspected the affair from late 2003[,] . . . [and] confirmed it on August 3, 2004[,]" this Court concludes that the circuit court once again abused its discretion

35

in ruling that the "Dear John" letter was inadmissible.[40] The admissibility of the subject

letter is to be determined at trial absent any consideration of the "attorney-client" privilege.

### V. Whether the circuit court abused its discretion in denying the Motion to Compel Physical and Mental Examination.

¶63. The circuit court's "Order Denying Defendants' Motion to Compel Physical and

Mental Examination of Plaintiff" found an absence of "good cause" and that "defendants

offered no evidence that the depositions of [Sam] and his treating physician and the

production of [Sam's] medical records are inadequate or insufficient to show [Sam's]

physical and mental status."

¶64. Mississippi Rule of Civil Procedure 35(a) provides, in pertinent part, that:

> [w]hen the mental or physical condition . . . of a party . . . is *in controversy*, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner . . . . The order may be made only on motion *for good cause shown* . . . .

Miss. R. Civ. P. 35(a) (emphasis added). Given the dearth of Mississippi caselaw on Rule

35, rendering this an issue of first impression for this Court, along with the limited nature of

the record with respect to this issue (i.e., only the motion and subsequent order), this Court

---

[40]Similarly, the circuit court abused its discretion in presumably finding no waiver by Sam, in concluding that the "Dear John" letter was inadmissible. "One measure" of the "continuing confidentiality" of a document "is the degree of care exhibited in [its] keeping, and the risk of insufficient precautions must rest with the party claiming the privilege." ***In re Horowitz***, 482 F.2d 72, 82 (2nd Cir. 1973) (quoting ***United States v. Kelsey-Hayes Wheel Co.***, 15 F.R.D. 461, 465 (E.D. Mich. 1954)). *See also* ***The Navajo Nation v. Peabody Holding Co.***, 255 F.R.D. 37, 45 (D.D.C. 2009) (quoting ***In re Sealed Case***, 877 F.2d 976, 980 (D.C. Cir. 1989)) ("to preserve privilege, a party must 'jealously guard[]' its confidential documents and treat them 'like jewels – if not crown jewels'"). Likewise, Sam failed to claim the attorney-client privilege, and did not seek privileged-communication status for the "Dear John" letter contained in the public records of the chancery court.

concludes that the circuit court did not abuse its discretion in denying Reed and Baker Donelson's Motion to Compel Physical and Mental Examination.

## CONCLUSION

¶65.   Accordingly, in Case No. 2008-IA-00768-SCT, this Court reverses the circuit court's denial of Reed's Motion for Partial Summary Judgment and Baker Donelson's Motion for Summary Judgment, and remands the case with directions to render partial summary judgment in favor of Reed as to Sam's claim of breach of fiduciary duty and summary judgment in favor of Baker Donelson, and for further proceedings consistent with this opinion.

¶66.   In Case No. 2008-IA-00999-SCT, this Court affirms the circuit court's denial of Reed's and Baker Donelson's Motion to Compel Physical and Mental Examination; reverses the circuit court's *sua sponte* (1) determination that the October 15, 2004, DVD recording was protected "attorney work-product" and inadmissible at trial and (2) determination that the "Dear John" letter was protected by the attorney-client privilege and inadmissible at trial; and remands for further proceedings consistent with this opinion.

¶67.   **2008-IA-00768-SCT: REVERSED AND REMANDED.**

**2008-IA-00999-SCT: AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**WALLER, C.J., CARLSON, P.J., DICKINSON, LAMAR, AND CHANDLER, JJ., CONCUR. PIERCE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. GRAVES, P.J., AND KITCHENS, J., NOT PARTICIPATING.**

**PIERCE, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

37

¶68. This Court has said, "[a]n attorney must deal with the client in a manner of 'utmost honesty, good faith, fairness, integrity, and fidelity. . . .'" *Tyson v. Moore*, 613 So. 2d 817, 823 (Miss. 1992) (quoting 7A C.J.S. *Attorney & Client* § 234 (1980)) (emphasis added). Therefore, I cannot agree with the majority on the issue of whether the adulterous affair between Reed and Rebecca constituted a breach of the fiduciary duty Reed owed to Sam as his attorney. The majority finds that "[n]o material facts have been presented to support that the subject affair was in any way 'related to the representation or arising therefrom'" (Maj. Op. ¶ 36) and holds that the trial court erred in denying partial summary judgment to Reed on Sam's breach of fiduciary duty claim. Because this is a question for the jury, I must dissent in part.

¶69. This Court has said, "*[w]ithout doubt*, a lawyer has a duty to inform his client of all matters of reasonable importance related to the representation or arising therefrom. This includes advice regarding matters *the client may reasonably see* as presenting conflicts of interest" *Id.* at 827 (citing Restatement (Third) of the Law Governing Lawyers § 31 (Tentative Draft No. 5 (1992)) (emphasis added). We have further held that the duty of loyalty includes the duty to "avoid conflicting interests that *might* impair the representation." *Id.* at 823 (emphasis added).

¶70. It is reasonable that Sam may have seen his lawyer's adulterous affair with his then-wife as presenting a conflict of interest to Reed's representation of him. Genuine issues of material fact exist, therefore, on the issue of whether the affair between Reed and Rebecca constituted a breach of the fiduciary duties Reed owed to Sam. Thus, the trial court properly denied Reed's motion for partial summary judgment as to this issue. This Court has recently

stated, "[o]rdinary jurors possess the requisite knowledge and lay expertise to determine if an adulterous affair between an attorney and his client's wife is a breach of a duty owed by an attorney to his client." *Pierce v. Cook*, 992 So. 2d 612, 618 (Miss. 2008). This issue should be left to such jurors.

¶71. I concur with the majority on all other issues. However, for the foregoing reasons, I would remand the issue of whether Reed's adulterous affair with Rebecca constituted a breach of the fiduciary duties he owed Sam, and must dissent from the majority opinion on that issue.