IRVING, P.J.,
dissenting:
¶ 84. I respectfully dissent, as I find no reversible error in the issues raised on appeal.

*1265
I. Denial of Motion for an IME

¶ 85. The majority finds the trial court erred in denying Dr. Brooks and EMA’s motion and renewed motion for an IME. In doing so, the majority, in essence, holds that a request for an IME should never be denied in a case where the plaintiff has asserted a physical or mental injury. However, this is contrary to the good-cause requirement set out in Mississippi Rule of Civil Procedure 35 and takes away any discretion of the trial judge.
¶ 86. Rule 35(a) states that when the mental or physical condition of a party is in controversy, the trial court “may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner[.]” However, “[t]he order may be made only on motion for good cause shown[.]” Id. The requirements of Rule 35 “are not met by mere conclusory allegations of the pleadings — nor by mere relevance to the case — but require an affirmative showing by the -movant that each condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination.” Schlagenhauf v. Holder, 379 U.S. 104, 118, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964). It is. within the trial court’s discretion whether to grant or deny a motion for an IME. Baker Donelson Bearman Caldwell & Berkowitz, P.C. v. Seay, 42 So.3d 474, 495 (¶ 64) (Miss.2010). Our review is limited to determining whether the trial court abused its discretion in granting or denying the motion. Id.
¶87. I agree with the majority that Tony’s physical condition was “in controversy,” since “[a] plaintiff in a negligence action who asserts [a] mental or physical injury ... places that mental or physical injury clearly in controversy!.]” Schlagenhauf, 379 U.S. at 119, 85 S.Ct. 234. However, I find that the trial court did not abuse its discretion in finding that Dr. Brooks and EMA failed to show good cause for the IME. Further, Dr. Brooks and EMA’s motión undisputedly did not comply with Rule 35(a) in that it- failed to state “the time, place, manner, conditions, and scopé of the examination” or “the person or person by whom”- the examination was to be made.

A. Failure to Show Good Cause

¶ 88. Dr. Brooks and EMA argue, and the majority agrees, that good causé was shown for an IME because the record lacked proof of when Tony reáchéd maximum 'medical ‘improvement. Dr. Brooks and EMA assert that because Dr. Lineaw-eaver did not treat Tony after January 12, 2011, and lacked experience with canthari-din, he could not assess Tony’s permanent or long-term injuries.
¶ 89. Although he was deposed by the Glovers, Dr. Lineaweaver was Tony’s treating physician’ and independently examined him prior to trial. Dr. Lineaweaver testified at trial by way of a videotaped deposition. Dri Lineaweaver is an expert in burn injuries, the head of Mississippi’s only burn center, and a board-certified plastic surgeon -with nearly forty years’ experience. He testified that Tony’s exposure to cantharidin resulted in “partial thickness,” or second-degree burns. These bums' penetrated through Tony’s skin and covered sixteen percent of his body. Dr. Lineaweaver' testified that when skin is burned in this way, it will not grow back perfectly, but will result in scarring. Dr. Lineaweaver testified that it was his opinion that Tony’s skin would never look the same, and that he would always have permanent scarring and skin discoloration. He also testified Tony would be sensitive to the elements and extreme temperatures. Dr. Lineaweaver stated that such bum wounds continue to heal for at least a year after injury. As a *1266 result of Tony’s burns, Dr. .Lineaweaver testified that it was “inadvisable” for Tony to work in jobs where he was exposed to sunlight or extreme temperatures. Although, he did not see Tony again after January 12, 2011, he stated' his opinion was based on ..“a reasonable interpretation of [his] examinations, plus the expectable course, plus whatever photographs [he] saw subsequently.” .
¶ 90. Dr. Brooks and EMA assert good cause existed, for additional testing of Tony’s shin sensitivities due to the passage of time since Dr. Lineaweaver’s examination. But when asked about the additional testing sought by the defense in its IME motion, Dr. Lineaweaver testified that he had “never seen those tests, with which [he was] reasonably familiar in other contexts, applied to a burn patient.” He was specifically asked about tests that could be done “[t]o determine sensitivity, thermal regulation, all sorts of things, sweat gland production.” Dr. Lineaweaver responded:
[I]n an area of injury that really extends through many parts of the body that has different levels of injury you know, clearly some of his skin returned to relatively normal color and everything else, others didn’t — it would be very hard to standardize a test like that. So pretty much clinical examination and functional interpretation of what the patient is saying would be the realistic way to assess whatever’s going on in terms of sweat, skin dryness and so on like that.
¶ 91. In addition to Dr. Lineaweaver’s testimony, Tony himself testified as to the continued effects of the burns, stating that he cannot be exposed to water that is too hot or too cold because, of his painful skin sensitivity. He testified he has trouble regulating his body temperature and has to layer on and off clothing to keep a normal temperature. As far as his skin’s appearance — -whether it was getting better or worse or staying the same — Tony testified that over the past year, his skin had stayed the same. Monique Ealy, director of children services at Stewpot Ministries, where Tony volunteered, testified that after Tony was burned, he had to shield himself from the sun by wearing a towel on his head, long socks, and long-sleeve shirts. As far as physical evidence of permanent or long-term scarring, during trial in December 2012, which was held two years after Tony was burned, Tony removed his shirt for the jury to view his injuries. Thus, the jury heard Tony’s testimony and could view for itself the extent of the injuries two years after they occurred.
¶ 92. “The specific requirement of good cause would be meaningless if good cause could be sufficiently established by merely showing that the desired materials are relevant, for the releyancy standard has already been imposed by Rule 26(b).” Schlagenhauf, 379 U.S. at 118, 85 S.Ct. 234. Rule 35’s, inclusion of the words “good cause” “indicate[s] that there must be greater showing of need under Rules 34 and 35 than under the other discovery rules.” Schlagenhauf, 379 U.S. at 118, 85 S.Ct. 234. “ ‘Good cause’ requires a showing that the examination could adduce specific facts relevant to the cause of action and necessary to the defendant’s case.” Ornelas v. S. Tire Mart, LLC, 292 F.R.D. 388, 391 (S.D.Tex.2013). “The ability of the movant to obtain the desired information by other means is also relevant.” Schlagenhauf, 379 U.S. at 118, 85 S.Ct. 234. While the rules of civil procedure “should be liberally construed, ... they should not be expanded by disregarding plainly expressed limitations.” Id. at 121, 85 S.Ct. 234.
¶93. I find that there was an abundance of available evidence as to Tony’s medical improvement that was, presented *1267 through the medical records and the testimonies of multiple physicians and others, including Tony .and his mother — all of whom were available to the defense prior to trial. Five treating doctors were available: Dr. Lineaweaver, Dr. Brooks, Dr. Hudson, Dr. Dillard, and Dr. Pqduda. Dr. Brooks and EMA also called their own expert, Dr. Chemene Quinn, a board-certified dermatologist. Dr. Quinn testified on behalf of the defense that cantharidiri is used to treat molluscum' “because it doesn’t cause as much scarring "as other therapies. It doesn’t cause scars.... It doesn’t go deep enough.” Dr. Quinn testified that cantharidin only affects the epidermis and that “by definition it doesn’t cause scarring,” only blistering. From viewing Tony’s body, she- testified she saw. no scarring, but rather pigmentary changes, or discoloration of'the skin, which can heál over time. She-also testified'she could not “find anything scientific” to support Tony’s sensitivities to heat, cold, and sunlight. Based on the abundance of evidence presented from both sides, I find Dr. Brooks and EMA have failed to specify in their motion what additional-information could be garnered from the IME that was not already available.
¶94. I also note that Dr. Brooks and EMA have not cited a "single comparable case in support of their Rule 35 argument. Not one case is cited where an IME was granted in light of the abundance of medical testimony available in this case. The majority cites two cases where IMEs were granted: Ragge v. MCA/Universal Studios, 165 F.R.D. 605 (C.D.Cal.1995),, and Galieti v. State Farm Mutual Automobile Insurance Co., 154 F.R.D. 262 (D.Colo.1994). In Ragge, the defense requested a mental examination * of the plaintiff after she filed a sexual-harassment and discrimination suit. Ragge, 165 F.R.D. at 608-09. In Galieti, an IME was requested to evaluate whether the plaintiff suffered emotional distress from an allegedly unlawful termination. Galieti, 154 F.R.D. at 262. Neither case involved an abundance of readily available medical testimony.
¶ 95. There is a lack of caselaw in Mississippi dealing with Rule 35; however, the-most recent supreme court decision involving Rule 35 also - does not support Dr. Brooks and EMA’s assertion that the trial court abused its discretion in denying the request for an IME. In Baker Donelson, 42 So.3d at 481 (¶20), an IME was requested to garner information on the plaintiffs mental and psychological injuries that were the basis of an intentional-infliction-of-emotional-distress claim. The trial court found the defense failed to show good cause for the examination and that the “defendants offered no evidence that the depositions of [the plaintiff] and- his treating physician and the production of [the plaintiff’s] medical records [were] inadequate or insufficient to show [the plaintiff s] physical and mental status.” Id. at 495 (¶ 63). The supreme court noted that the matter was one of first impression. Id. While citing the limited nature of the record, the supreme court nonetheless found no abuse of discretion in the trial court’s finding. Id.
¶ 96. Dr. Brooks and EMA have failed to show the available depositions and medical records were inadequate or insufficient to present the jury with evidence of Tony’s long-term injuries. This is not a case where the plaintiffs injuries are disputed. Dr. Brooks openly admitted his negligence, and that his negligence resulted in Tony’s injuries. Dr. Brooks admitted the following in his deposition:
Q. Do you take any responsibility for yourself, Dr. Brooks[,] for Anthony’s injuries, not just for the prescription but for Anthony’s injuries?
A. Yes.
*1268 During trial, Dr. Brooks’s counsel, in the presence of the jury, stated to Tony during his cross-examination, “Tony, I don’t have a lot of questions for you. I don’t dispute that you were injured at all, and I’m sorry you were injured.”
¶ 97. Dr. Brooks and EMA have failed to show an IME of Tony was necessary. Thus, I find the trial court did not abuse its discretion in finding lack of good cause for an IME.

B. Failure to Comply with the . Form, Required by Rule 35

¶98. In addition lacking good cause, Dr. Brooks and EMA’s motion for an IME failed to comply with the specificity requirements of Rule 35. Rule 35 requires the motion to include the “time, place, manner, -conditions, and scope of the examination and the person or person by whom it is to be made.” The burden is on the movant to “produce sufficient information, by whatever means, so • that the [trial] judge can fulfill his function mandated by the Rule” — that is, a determination of whether the motion meets Rule 35’s re--quirements of “in controversy” and “good cause.” Schlagenhauf, 379 U.S. at 121, 85 S.Ct. 234. “Parties seeking a court-ordered mental or physical examination should ... provide the necessary details to the court, or they otherwise risk denial of their motions solely on the gro.unds that the court cannot comply with this provision of the Rule.” Ornelas, 292 F.R.D. at 398. The “[pjlaintiff is .... entitled to a certain degree of direction regarding those examinations, thereby providing him the opportunity to bring to the [c]ourt’s attention those tests he deems irrelevant or harmful.” Id.
¶ 99. Dr. Brooks and EMA’s IME motion simply requests an IME of Tony “to be performed by a dermatologist selected by the party seeking the examination, at a time and place to be agreed upon by the parties.” There is no information in the motion upon which the plaintiff could lodge an objection. Further; not only does the motion fail to include a proposed doctor to conduct the examination, the motion specifies the doctor will be selected by Dr. Brooks and EMA, which is contrary to the suggestion of an “independent” medical examination.
¶ 100. Citing Federal Rule of Civil Procedure 35, upon which Mississippi’s rule is based, other jurisdictions have noted that “[n]o absolute right to the choice of a doctor is expressed in Rule 35.” Stuart v. Burford, 42 F.R.D. 591, 592 (N.D.Okla.1967). “[W]hen no serious objection arises, it is probably best to appoint the doctor of the moving party’s choice.” Chaney v. Venture Transport, Inc., No. Civ.A. 03-2886, 2004 WL 445134, at *1 (E.D.La.2004) (citing 8A Wright, Miller & Marcus, Federal Practice and Procedure § 2234.2 (2d ed.1994)). However, where “the plaintiff has made strenuous objection to defendant’s choice of physician[,] ... it is best that another physician be appointed. If the parties can select a physician mutually agreeable, his name may be submitted. If not the [cjourt will make its own choice.” The Italia, 27 F.Supp. 785, 787 (E.D.N.Y.1939). The plaintiffs had no opportunity to object to the choice of physician, as the defense failed to name one.
¶ 101. Given the lack of good cause and the failure to comply with Rule 35’s requirements, the trial judge determined the IME motion should be denied. There is nothing to indicate he abused his discretion in doing so.

C, The Trial Court’s Failure to Promptly Rule on the IME Motion

¶ 102. I also do not find the trial court erred in delaying its ruling on the motion for an IME. Dr. Brooks and EMA filed *1269 their IME motion on March 26, 2012. A hearing was held on April 19, 2012, at which time the trial court took the matter under advisement. The trial court then denied the motion on November 30, 2012. On December 6, 2012, Dr. Brooks and EMA filed a renewed motion for an IME based on their recent deposition of Dr. Lineaweaver. The renewed motion was denied on December 10, 2012, just prior to the beginning of trial.
¶ 103. The burden is on the movant to take action on pending motions. Busby v. Anderson, 978 So.2d 637, 639 (¶ 11) (Miss.2008) (The movant has “a duty to diligently pursue [its] claim,” such as by following up on pending motions or by filing a mandamus petition.). I find Dr. Brooks and EMA cannot now complain of the trial court’s failure to rule promptly, as Dr. Brooks and EMA failed to pursue their motion. Rather, I find the trial court’s failure to address the issue is tantamount to a denial. I cannot find the trial court erred in not ruling on the motion in a more timely manner.

II. Admissibility of Dr. Lineaweaver’s Expert Testimony on Permanent Impairment

¶ 104. The majority next finds that the trial court erred in admitting Dr, Lineaw-eaver’s expert testimony on Tony’s permanent injuries. The majority finds the testimony was unreliable because Dr. Li-neaweaver did not examine Tony after January 12, 2011, and did not review any medical records past May 11, 2011.
¶105. In determining whether expert testimony is admissible as provided in Mississippi Rule of Evidence 702, we look to whether the testimony is relevant and reliable. Hale v. State Democratic Exec. Comm., 168 So.3d 946, 955 (¶29) (Miss.2015) (citing Miss. Transp. Comm’n v. McLemore, 863 So.2d 31, 38 (¶16) (Miss.2003)). “The admission of expert testimony is within the sound discretion of the trial judge.” Id. We “will not reverse a trial court’s decision to exclude expert testimony unless .it finds that the trial court’s decision was arbitrary and clearly erroneous, amounting to an. abuse of discretion.” Id.
11106. There is no dispute that Dr. Li-neaweaver was eminently qualified to testify at trial. He obtained his medical license in 1976 and served as the chief of plastic surgery at the University of Mississippi Medical Center from 2003-2007. At the time of trial, he was the head of Mississippi’s only burn center, the' JMS Burn & Reconstructive Center, where he treated Tony. He testified that since starting the JMS Burn Center in 2009, he had treated well over a thousand burn patients. Because Dr. Lineaweaver testified through video deposition, the trial court directed the parties to make objections during the videotaping, and the trial court would later rule on. the objections. Based on the trial court’s rulings on the various objections, the video was edited to exclude any inadmissible testimony.
¶ 107. Dr. Lineaweaver admitted that he was not familiar specifically with can-tharidin burns, apparently because this medication is rarely, if ever, used in his practice and that he had seen no patients who had presented themselves to the bum center with this type- of burns. However, Dr. Lineaweaver testified he was very familiar with the type of injury that resulted from the misuse of the medication — second-degree chemical burns. Tony was diagnosed at UMMC with chemical burns, and Dr. Lineaweaver’s diagnosis was consistent with UMMC’s diagnosis. Dr. Li-neaweaver testified about the second-degree burns and gave his opinion on their long-term effects. There is no per se rule excluding Dr. Lineaweaver’s testimony be *1270 cause he had no prior experience with cantharidin, especially considering his familiarity with the resulting burn injuries,
¶ 108. Dr. Lineaweaver gave his opinion of the long-term effects of Tony’s injuries based on the information available to him and his experience with thousands of bum patients. He made this very clear in his testimony. For example, when asked if Tony is now more sensitive to sun exposure, he answered, “Based on the available information, I would say he is.” He stated that the available information included “[his] examinations, the understanding of [Tony’s] original injury, and the most recent credible photographs that [he] saw[.]” The photographs he viewed were dated January 2011 through June 2012. He testified that over that eighteen-month time period, the pictures “certainly show the same hypopigmentation areas that are seen in all the other pictures. They don’t seem to have changed. Those areas, in my opinion, would be sun sensitive.”
¶ 109. The notes from Tony’s December - 22, 2010 examination with Dr. Li-neaweaver reflect that Tony had a “scar condition” and “fibrosis of skin,” and was instructed to.apply moisturizing lotion liberally several times a day- and to avoid sun exposure. Dr. Lineaweaver explained this assessment and treatment plan as follows: .
A. Many second[-]degree burns do not have a return to normal skin. They have residual areas of, in effect, fi- ■ brosis, skin areas or appendages that have been' replaced by scar. So ... [management] include[s] skin care with moisturizing lotion because regenerated — or tissue like the fibrotic skin tissue may have fewer sweat gland[s], can become dry and easily irritated. Sun exposure can easily proceed to a much more damaging level in fibrotic skin because, ultimately, the layers of the skin are shallower than normal. So blistering can be more severe. Secondary scarring from sunburn can be more likely. And generally, sun exposure is not well tolerated by somebody who’s had a second degree burn with some residual replacement of normal skin by scar tissue.
Q. And in Anthony’s case, is that what you found?
A. Yes.
¶ 110. Testimony- is reliable if it is “grounded in the methods and procedures of science, [and] not merely a subjective belief or unsupported speculation.” Worthy v. McNair, 37 So.3d 609, 615 (¶16) (Miss.2010). Dr. Lineaweaver’s testimony was not a subjective belief or unsupported speculation. It was based on the information before him and his experiences with thousands of burn patients. Further, Dr. Lineaweaver’s testimony was subject to extensive cross-examination, where the defense was free to emphasize that Dr. Li-neaweaver had not personally examined Tony since January 12, 2011. Dr. Lineaw-eaver admitted he did not know Tony’s final point of healing. Regardless, the jury heard testimony from Tony himself regarding the long-term effects of his injuries and physically saw Tony’s body when he removed his shirt at trial.
¶ 111. Dr. Lineaweaver’s testimony regarding his opinion of Tony’s permanent or long-term injuries was properly admitted as relevant and' reliable. Any questions regarding the credibility or weight given to his testimony were subject to determination by the jury. Univ. Med. Ctr. v. Martin, 994 So.2d 740, 747 (¶25) (Miss.2008). Because the evidence shows that Dr. Lineaweaver’s testimony on Tony’s permanent injuries was relevant and reliable; I find no abuse of discretion *1271 by the trial judge in admitting his testimony. I would affirm on this issue.

III. Economic-Damages Verdict

¶ 112. The jury awarded Tony $1,500,000 in economic damages. Dr. Brooks and EMA argue, and the majority finds, that this amount was not supported by the credible evidence.
¶ 113. Dr. Glenda Glover[5] testified at trial regarding Tony’s future lost wages. She testified that, based on his permanent injuries, his lost wages were approximately $707,686 with no college degree and up to $2.5 million with a college degree. Tony’s undisputed medical expenses were $112,499. The majority takes issue with the fact that Dr. Glover’s testimony was based in part on Bruce Brawner’s jobs analysis, which was based in part on Dr. Lineaweaver’s testimony regarding Tony’s permanent injuries. Based on its finding that Dr. Lineaweaver’s testimony on permanent injuries was unreliable, the majority likewise finds Dr. Glover’s testimony on lost wages unreliable. Consequently, the majority finds the economic-damages verdict is improper to the extent it exceeded the undisputed amount of $112,499.
¶ 114. As I find Dr. Lineaweaver’s testimony was properly admitted, I also find the jury’s economic-damages -verdict should be affirmed. “The amount of damages is a question for the jury.” Downs v. Ackerman, 115 So.3d 785, 790 (¶ 16) (Miss.2013). A jury award generally will not be “set aside unless so unreasonable- as to strike mankind at first blush as being beyond all measure, unreasonable in amount and outrageous.” Id. Dr. Brooks admitted his negligence resulted in' Tony being chemically burned. The jury heard and saw that Tony was scarred. The jury also heard that he was ■ temperature sensitive and had lost access to certain jobs. The testimony showed Tony’s estimated future lost wages plus medical expenses fell between $820,185 and $2,612,499. The economic-damages award of $1,500,000 was not unreasonable considering the evidence presented. I would affirm on this issue.
TV. Superseding-Cause Jury Instruction -
11115. Finally, the majority finds that thé trial court erroneously denied Dr. Brooks and EMA’s request for superced-ing-cause jury instruction D-10. It states in part:
[I]f you find from a preponderance of the evidence that Dr. Brooks was negligent, but that an independent and unforeseeable negligent act by Marty’s Pharmacy in failing to direct, instruct, counsel or otherwise exercise reasonable care in compounding and dispensing cantharidin to the Glovers came after Dr. Brooks’[s] acts and was k substantial factor in causing Anthony Glover’s injuries, if any, then John Brooks, M.D. and Emergency Medicine Associates of Jackson, PLLC are not liable for any injuries proximately resulting from the superseding cause, and your verdict shall be in favor of John Brooks, M.D. and Emergency Medicine Associates of Jackson, PLLC.
¶116, I find this proposed instruction was correctly refused for two reasons. First, it does not instruct the jury on Mississippi’s comparative-negligence law. Mississippi is a pure comparative-negligence state. Burton v. Barnett, 615 So.2d 580, 582 (Miss.1993). “Under the comparative negligence doctrine, negligence is measured in terms of percentage, and any damages allowed shall be diminished in proportion to [the] amount of negligence *1272 attributable to the person for whose injury, damage[,] or death recovery is sought.” Id. The proposed instruction states that the jury must find in favor of Dr. Brooks and EMA if Marty’s Pharmacy’s actions substantially caused Tony’s injuries. This is not an accurate statement of the law, as the jury could find and attribute fault to each party. Second, Dr. Brooks’s theory of defense — that Marty’s Pharmacy’s actions were the proximate cause of Tony’s injury — was fairly covered in the given jury instructions. The given instructions permitted the jury to find the pharmacy entirely liable for Tony’s injuries, if that is how it chose to attribute fault. We will not find error in the refusal of a jury instruction if “the [given] instructions, taken as a whole, ... fairly present the applicable law.” Young v. Guild, 7 So.3d 251, 259 (¶ 24) (Miss.2009). “[I]f other instructions [that are given] adequately instruct the jury, a party may not complain of a refused instruction on appeal.” Id.
¶ 117. Because instruction D-10 does not accurately reflect Mississippi’s comparative-negligence law, and because Dr. Brooks and EMA’s theory of defense was covered elsewhere in the given instructions, I cannot find the trial court erred in refusing proposed instruction D-10.
¶ 118. For the reasons stated, I dissent. I find no reversible error and would affirm the jury’s verdict.
LEE, C.J., JOINS THIS OPINION.

. Dr. Glover is not related to the Appellee or her minor son.