# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00505-COA

TERRANCE JOHNSON                                                    APPELLANT

v.

SW GAMING LLC D/B/A HARLOW'S CASINO                           APPELLEES
RESORT AND SPA, CHURCHILL DOWNS
INCORPORATED, DOLLAR GENERAL
CORPORATION, DOLGENCORP, LLC AND
LAWRENCE PERKINS

DATE OF JUDGMENT:           04/10/2023
TRIAL JUDGE:                HON. RICHARD A. SMITH
COURT FROM WHICH APPEALED:  WASHINGTON COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:    CHARLES M. MERKEL JR.
                            CORRIE SCHULER
                            EDWARD P. CONNELL JR.
ATTORNEYS FOR APPELLEES:    HARRIS FREDERICK POWERS III
                            CHARLES CAMERON AUERSWALD
                            RICHARD L. KIMMEL
                            JOHN H. DANIELS III
NATURE OF THE CASE:         CIVIL - PERSONAL INJURY
DISPOSITION:                AFFIRMED - 10/22/2024
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., WESTBROOKS AND McDONALD, JJ.**

**McDONALD, J., FOR THE COURT**:

¶1.     Terrance Johnson was shot after attending a holiday party for employees of

Dolgencorp LLC ("Dollar General") and their guests at Harlow's Casino Resort and Spa,

which was owned by SW Gaming LLC ("Harlow's").  Johnson sued Harlow's and Dollar

General, as well as a Dollar General manager Lawrence Perkins.  Johnson alleged, among

other things, that his injuries were the result of Harlow's inadequate security and violations

of policies by Dollar General employees. The Washington County Circuit Court granted Harlow's motion for summary judgment and denied Johnson's motion for reconsideration. The circuit court also granted Dollar General and Perkins's joint motion for summary judgment. Johnson appealed and argues that he presented sufficient proof of actionable negligence to withstand summary judgment. Having reviewed the record, the arguments of counsel, and the relevant caselaw, we affirm both judgments of the circuit court.

**Facts**

*Incident on December 5, 2015*

¶2.     On the night of December 5, 2015, the Indianola Dollar General Distribution Center held a holiday party for the center's employees and invited guests at Harlow's Casino in Greenville, Mississippi. Johnson and Vandetrik Lockhart attended the party as guests of Kewanda Williams, a distribution center employee with whom Johnson had an "off-and-on" relationship for several years. The party was held at Harlow's Event Center, a smaller building adjacent to the main casino. Williams parked her car in the customer parking lot located directly in front of the casino, and the three proceeded to the Event Center for the holiday party.

¶3.     Also attending the party were Jamal Mayfield and Roderick Spain, co-workers with Williams. Johnson knew Spain personally but did not know Mayfield, though Johnson was aware that Mayfield and Williams had been romantically involved, briefly. Prior to that night, Johnson's only communication with Mayfield had occurred months before, when

Johnson, who had Williams's phone, responded to several text messages from Mayfield.[1] After several exchanges, Mayfield said he noticed a "vulgar shift" in the tone of the messages, and he realized that it was Johnson who was texting him. The text conversation ended, and according to Johnson, they had no "beef" with each other.

¶4. On the night of the holiday party, Johnson observed Mayfield and Spain across the room, whispering and looking at him. Johnson said he walked up to their table and asked whether his being at the party with Williams was a problem "because if it is, we can go on and straighten this out right now." Mayfield, however, said Johnson came up and put his arms around both his and Spain's necks and said that he "would go all the way in," which Mayfield took as a threat. Spain told Johnson there would be no problem. Johnson then found Williams and asked her to speak to Spain and Mayfield, which she did. When she returned, she told Johnson that she felt they should leave. They proceeded to the exit along with Lockhart, but because security would not let Lockhart and Williams leave the premises with the drinks they had purchased from the cash bar, Johnson let them stay to finish while he walked over to the casino.

¶5. Meanwhile, shortly after Johnson had confronted them, Spain and Mayfield said they, too, felt uneasy and decided to leave as well. They first stopped by the restrooms, where they encountered Perkins, a manager at the distribution center. Mayfield said that he told Perkins that some guy had approached him at the party about a lady whom Mayfield was no longer interested in and that he was going to leave in case anything should happen that might

---

[1] According to Johnson, Mayfield initiated the texting; Mayfield says it was Johnson, impersonating Williams, who initially texted him.

threaten his job. According to Perkins, Spain told him they were leaving because "old boy" was "tripping." Perkins said neither Mayfield nor Spain identified the individual who had spoken to them, nor were they more specific about what that individual was doing, so Perkins took no action. Mayfield and Spain proceeded to the parking lot.

*The Altercation*

¶6. The parties disputed who initiated the fight in the parking lot. Johnson said that after he walked around the casino for a while, he proceeded to the parking lot to look for Williams's car. As he was walking and searching, Johnson claimed that he was blind-sided by Mayfield, who had come upon him without any warning or provocation. Johnson said Mayfield yelled at him, grabbed him by the collar trying to choke him, and pushed him against a car. Johnson defended himself, and the two fought for several minutes. Johnson said he hit Mayfield about four times, and Mayfield "ended up on the ground." As he started to walk away, Spain blocked him. Johnson told Spain to quit grabbing him because he (Johnson) wanted to leave. By that time, Mayfield had gotten up, and Johnson said he told Mayfield that the fight was over and that he had lost. At that point, Johnson said he turned, thinking Mayfield was coming after him. Then Johnson heard a click and a bang and realized that Mayfield had pulled a gun and shot him.

¶7. Mayfield, however, said that as he was walking to his car, he saw Williams and Spain talking, and he joined them. When he saw Johnson approach, Mayfield left and started towards his car, which was about ten feet away. Mayfield said Johnson came from around Mayfield's car and blocked him. Johnson grabbed Mayfield's sweater, and Mayfield grabbed

4

Johnson's collar in return as they began tussling. Mayfield said Johnson, who outweighed him, pushed him back so hard that he ended up on the ground with torn ligaments (his MCL and ACL). Mayfield said Johnson got on top of him and beat him until Mayfield became unconscious. When he "came to," a bystander named Charles Nash helped Mayfield to his feet. Mayfield said he went to lock his car because he knew he needed medical attention, but Johnson came after him. As Johnson knocked Mayfield against the back of Mayfield's car, Mayfield said his pistol fell out of his pocket.[2] Mayfield said that as he was falling down, he retrieved his gun and shot it, intending just to scare Johnson.

¶8. Spain said that when he and Mayfield exited, they ran into Williams and walked with her to her car. Spain looked for Johnson because he wanted to see if Johnson still had a problem with him or Mayfield. Mayfield found Johnson first, and Spain heard Johnson say that he had nothing to say to Mayfield. The two grabbed at each other and started pushing each other between the cars. When they came from between the cars, Johnson, who was bigger than Mayfield, put his full weight on Mayfield and brought Mayfield down. Johnson continued to pound on Mayfield while Spain tried to pull him off. Spain managed to pull Johnson off twice, but each time, Johnson got loose and resumed hitting Mayfield. Spain heard Mayfield tell someone that he could not move his leg. When Spain tried to hold Johnson a third time, Johnson got free and said that he was going to kill Mayfield. That's when Spain heard the gunshot.

¶9. After the shooting, security officer Javaurus Ray, who was headed from the casino to

---

[2] Mayfield had a concealed-carry gun permit.

5

the event center on another matter, heard that someone was shot in the parking lot of the casino. Ray rushed to the area and found Johnson lying on the ground, face down in a pool of his own blood, and Mayfield leaning against his car.

¶10.   Harlow's incident report included a minute-by-minute breakdown of the activity Harlow's security gleaned from surveillance cameras. The Washington County Sheriff's Department responded to the incident, and an ambulance from Med-Stat later arrived. First responders treated both Johnson and Mayfield; Johnson was airlifted to the University of Mississippi Medical Center, while Mayfield's leg injuries were treated on-site. Once he was treated, Mayfield was transferred to the Washington County Sheriff's Department. As a result of the shooting, Johnson was rendered quadriplegic.

¶11.   In separate proceedings, Mayfield was charged with aggravated assault and tried on January 9, 2018. Mayfield, Williams, Spain, and Johnson testified at the trial to the facts recited above. At the conclusion of the trial, the jury found Mayfield not guilty of aggravated assault.

*Johnson's Lawsuit*

¶12.   On March 12, 2018, Johnson filed the instant negligence action against SW Gaming LLC and its parent company Churchill Downs Inc. (Harlow's) and Dolgencorp LLC (Dollar General). Johnson pleaded that Harlow's and Dollar General failed to provide adequate security at the Event Center given the history of criminal activity in the area. Johnson also alleged that Harlow's and Dollar General failed to screen guests and employees for weapons and allowed an unreasonably dangerous condition to exist. In an amended complaint filed

6

on May 4, 2018, Johnson added Perkins as a defendant whom he sued individually. Johnson alleged that as a Dollar General supervisor, Perkins violated established Dollar General policies that required him to address and investigate the report of the altercation during the party between Mayfield and Johnson.

¶13.  The defendants answered and denied the allegations in Johnson's complaint. Discovery ensued thereafter, including multiple depositions, interrogatories, and an exchange of documents, including the transcript of Mayfield's January 9, 2018 trial. Ultimately, Harlow's, Dollar General, and Perkins filed motions for summary judgment.

*Premises Security Offered by Harlow's*

¶14.  In a deposition, Melissa Martin, the security operations manager at Harlow's, explained Harlow's security systems. She said that there were two main public areas at Harlow's—the Event Center and the gaming area. Harlow's posted security guards at the front entrance of the casino to prevent underage or intoxicated persons from entering. Harlow's also posted several security guards throughout the casino.

¶15.  Harlow's normally had a security guard ("mobile rover") patrolling the site's three parking lots—the trucker's parking lot, the customer parking lot, and the employee parking lot—in a Chevy Equinox with a security logo. The patrol officer was expected to be in each lot every five minutes. Harlow's also had a security dispatcher, who monitored all radio traffic from the security officers' radios.

¶16.  Harlow's employed at least one security supervisor on duty each shift, as well as an assistant supervisor on certain days. Harlow's also provided valets who were stationed in

7

front of the parking lot. In addition to security personnel, there were security cameras stationed throughout the premises, including in the parking lot.

¶17. When there was a function at the Event Center, one security officer would be posted at the door, and another patrolled the function inside. Harlow's did not permit weapons on the premises, but it also had a "no contact" policy that prevented physical "pat downs" of its patrons. The Event Center also posted a sign that firearms and weapons were not allowed, and if firearms were detected visually, the Washington County Sheriff's Department would be contacted. Harlow's "no physical contact" policy extended to altercations; if a physical altercation occurred between patrons, a sheriff's deputy would be contacted.

¶18. In an affidavit supporting Harlow's motion for summary judgment, Martin said she reviewed the security camera footage from that night. She stated that she observed the Harlow's security vehicle patrolling the parking lot between 11:20 p.m. and 11:23 p.m. Martin averred that she saw Mayfield with two unknown males and an unknown female at 11:33 p.m. At that time, no altercation had begun. There was no camera footage of the actual altercation or the shooting. However, from the tape she viewed, Martin said it was clear that at 11:36 p.m., security personnel who had been notified of the shooting incident were responding. Based on this security footage, Martin believed that the entire altercation took no more than three minutes from beginning to end. Lastly, in her affidavit, Martin stated that between December 2012 and December 2015, there were approximately 2,718,273 casino patrons. She provided a breakdown of the number of patrons by year.

¶19. In response to Harlow's summary judgment motion, Johnson provided an affidavit

8

from Renna Brown, a former Harlow's security officer. In it, he said that on the night of the incident, he was originally scheduled as the roving parking lot officer during the casino's graveyard shift starting at 11 p.m. Brown stated that the Dollar General party was ending as his shift was starting. However, due to a staff shortage and the large number of customers on the premises, Brown was reassigned from the parking lot to the casino's main entrance to check for identification. After the party was over, Brown resumed his duty patrolling the parking lot. Therefore, he stated, there was no security in the parking lot at the time of the incident, and he noted that no one else drove the security rover during Brown's reassignment.

*Johnson's Expert Charles D. Saums*

¶20. Johnson designated Charles Saums as an expert in the field of private security services.[3] Saums had served as a security expert in over fifty premises liability cases. Saums owned a regional security equipment and investigative contracting firm and also had served as a police officer for the city of Jackson, Mississippi. The record reveals he also had experience in designing security systems for government agencies, manufacturing facilities, hospitals, retail stores, chemical plants, and two nuclear power facilities. According to the record, with over fifty-five years of experience, Saums was familiar with industry standards, protocols, duties, and legal duties of care applicable to the planning, coordination, implementation, and management of security systems.

¶21. Saums based his opinions on material obtained through the litigation and secured from

---

[3] Harlow's filed a motion in limine to exclude Saums as an expert, challenging Saums's qualifications and opinions under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). There was no ruling on this motion because summary judgment was granted.

9

Washington County Sheriff's Department related to the shooting. This included forty-three reports of incidents at Harlow's from the Washington County Sheriff's Department between 2010 and 2015, including simple assault, disorderly conduct, threatening, robbery, attempted robbery, and domestic assault. However, only eight of those incidents involved activity in the casino's parking lot, and only two of those eight incidents involved a gun. Lastly, Saums also reviewed Harlow's written security protocols.

¶22. In answers to interrogatories and in his designation of experts, Johnson provided Saums's opinions. With respect to Harlow's liability, Saums noted that Harlow's had reassigned the parking lot guard when it was short-handed, and Saums opined:

> Rather than immediately supplement[ing] the short staffed security force by calling in appropriately trained security officers or law enforcement, Harlow's security management made a conscious decision to negligently eliminate the most essential element of any perimeter/parking lot security program, the roving patrolman, deliberately leaving three large parking lots completely unmonitored and unprotected.

Further, Saums stated that based on his experience in providing private security for large events,

> had Harlow's provided even one roving patrolman equipped with a vehicle with a blue strobe light, as provided under normal operating conditions, in all probability the incident at issue would have been quickly defused [sic], the crowd would have dispersed, and Plaintiff Terrence Johnson would not have been shot and critically injured.

Saums said the security in the parking lot was not only inadequate, it was nonexistent.

¶23. In his deposition, however, Saums acknowledged that the dispute between Johnson and Mayfield was purely personal. Saums also admitted that there was no evidence that Harlow's knew or should have known of Mayfield's alleged violent nature before the

10

December 5, 2015 incident. Saums agreed that Johnson was the aggressor in this situation, displaying "intimidating" behavior even while inside the Event Center.

¶24. However, Saums held fast to his opinion that Harlow's failure to provide parking lot security on the night of the incident constituted a violation of the casino's own security plan, which, in his opinion, had been adopted "in recognition of foreseeable risk of violence on the premises." Saums concluded there was an atmosphere of violence at Harlow's based on crime statistics from the area. Saums reviewed the forty-three reports from the Washington County Sheriff's Department of incidents at Harlow's in the prior five years. Of those incidents, Saums highlighted three involving a gun: a February 20, 2012 incident of property damage where a patron fired a handgun into a slot machine inside the casino and two robberies of casino patrons in the parking lot on January 7, 2013, and July 20, 2013.

¶25. As to Dollar General's liability, Johnson's expert designation indicated that Saums would testify that Dollar General failed to plan and provide security for the party, that management failed to monitor the confrontational behavior of guests at the party and report said confrontational behavior to those in charge, and failed to enforce its own "Standards of Behavior" that its policy required.[4] Saums also opined that if it were not for Dollar General's aforementioned failures, more likely than not, Johnson would not have been assaulted. Lastly, Saums would testify that Johnson's assault and injuries were reasonably foreseeable.

¶26. In his deposition, Saums agreed that Dollar General, its employees, and its guests were invitees of the casino because Dollar General paid the casino for the use of its facilities and

---

[4] Saums refers to this policy, but no document titled "Standards of Behavior" appears in the record.

11

to cater the party. Saums also testified that the party-goers, including Johnson, enjoyed the benefits of the party hosted by Dollar General free of charge and were, therefore, licensees or social guests. When questioned by opposing counsel, Saums agreed that he would not expect any of the party-goers to be security experts or question how the casino chose to secure its premises. He also agreed that Dollar General played no active role in the incident.

*Harlow's Motion for Summary Judgment and Johnson's Response*

¶27. On September 27, 2021, Harlow's filed a motion for summary judgment and memorandum in support. Harlow's noted that it was undisputed that (1) Harlow's had no notice of any violent propensities of either Johnson or Mayfield prior to the incident, and (2) the argument between Johnson and Mayfield concerned their relationship with Williams and was unrelated to Harlow's operations and premises. Harlow's argued that the nonexistence of an atmosphere of violence at the casino and the "purely personal" nature of the dispute warranted summary judgment. There were very few incidents of prior criminal activity in the area in the years before the incident, and those that did occur were substantially dissimilar to the Mayfield-Johnson dispute. Therefore, no atmosphere of violence existed on the premises. Even if an atmosphere of violence existed, Harlow's had no duty to warn Johnson of anything because Johnson's own aggressive conduct created and caused the altercation. Lastly, Harlow's noted that Saums, Johnson's own expert, identified Johnson as the aggressor in the incident.

¶28. In support of its motion, Harlow's retained Dr. Bruce Jacobs, a professor of criminology at the University of Texas at Dallas, who had over twenty-five years of

12

experience in the field. Jacobs held a doctoral degree in sociology with a specialization in criminology and scientific research that focused on serious criminality, predatory violence, and illegal drug distribution. He also served a multi-year term as chair of the University of Texas Safety and Security Council, which had been tasked to develop, implement, and evaluate a comprehensive safety and security plan for the university. He reviewed all the materials obtained or generated through the litigation, as well as the crime data for the three years preceding the incident, to form his opinion. This data revealed only one weapon-involved violent crime in the parking lot, which occurred two years before this incident. In that incident, the robbery victim was not injured. In Dr. Jacobs's opinion, there was no atmosphere of violence at Harlow's that would put Harlow's on notice of a potential incident such as the Johnson shooting. Jacobs reviewed the facts of the Johnson incident and determined that it was victim-facilitated and targeted. Dr. Jacobs concluded that the security in place was adequate. Overall, he opined:

> In summary, the subject-shooting was a victim-precipitated targeted crime that Harlow's could not have reasonably foreseen or prevented. Plaintiff contributed substantially to the chain of events that led to his injury. There is no evidence that Harlow's was precipitent in the acrimony between the Plaintiff and Mayfield, nor did Harlow's impel the shooting in any way. There was no atmosphere of violence at Harlow's. The crime prevention posture of Harlow's was adequate and reasonable relative to the risk. There is no evidence that the presence of additional measures would have prevented this incident.

¶29. On December 15, 2021, Johnson filed his response and memorandum of law in opposition to Harlow's motion for summary judgment, arguing that Harlow's assumed a duty

13

of care by adopting "mandatory" security procedures[5] and breached these by failing to have a security guard patrolling the parking lot. Johnson contended that had Brown not been reassigned, the patrol car's strobe light would have diffused the situation in time. Harlow's creation of its security procedures, Johnson argued, proved that Harlow's recognized and appreciated the need to protect its customers from foreseeable acts of violence. Johnson also argued that by adopting security policies to prevent such an occurrence, Harlow's admitted the altercation was foreseeable, which established legal causation. Johnson contended that the incident and injury were foreseeable because of the number of violent crimes on the property between 2010 and 2015.

*Circuit Court's Ruling on Harlow's Motion*

¶30. On March 11, 2022, the circuit court granted Harlow's motion for summary judgment. The court stated:

> The Mississippi Supreme Court has held that in premises liability cases, there are two ways to establish foreseeability in cases of assault by a third person. Cause to anticipate the assault may be imputed to the premises owner by virtue of (1) actual knowledge of the third party's violent nature, or (2) actual or constructive knowledge that an atmosphere of violence exists on the premises.

(Citations omitted). The court emphasized that to determine whether an atmosphere of violence existed on the premises, Mississippi law requires an analysis of both (1) the overall pattern of criminal activity prior to the event in question that occurred in the general vicinity of the defendant's business premises, as well as (2) the frequency of criminal activity on the

---

[5] Johnson used the term "mandatory" in describing the security procedures but did not indicate if any official third-party organization or public body "mandated" the procedures.

14

premises. The court found that of the eight reports made to law enforcement between 2010 and 2015 of criminal incidents in the casino parking lot, only two involved a gun, which was not enough to establish an atmosphere of violence. The trial court noted that the Mississippi Supreme Court had rejected Johnson's argument that implementing policies for parking lot security established an awareness of an atmosphere of violence on the premises. Because the court found no atmosphere of violence on the premises, it granted Harlow's motion for summary judgment.

¶31. On March 21, 2022, Johnson moved the court to reconsider its grant of summary judgment in favor of Harlow's casino. Johnson contended that the court misinterpreted his argument regarding foreseeability. However, the trial court found no merit and denied Johnson's motion for reconsideration.

> *Dollar General and Perkins's Motion for Summary Judgment and Johnson's Response*

¶32. Dollar General and Lawrence Perkins also filed a joint motion for summary judgment on January 18, 2022.[6] They argued that the employees and guests at the party were licensees, and, thus, Dollar General's duty to Johnson was only to not willfully or wantonly hurt him. Perkins specifically argued that like everyone else, he was a party-goer and was not acting that night in his official capacity as a supervisor. Both Dollar General and Perkins argued that there was no proof that they had any awareness of Mayfield's alleged violent behavior,

---

[6] The circuit court judge who had considered Harlow's summary judgment motion recused from considering Perkins and Dollar General's motion because a relative of the judge had married Lawrence Perkins. After that judge recused, Dollar General and Perkins's motion was considered by a different circuit court judge.

and therefore they were not the proximate or contributing cause of Johnson's injuries.

¶33.   In response, Johnson argued that a "premises liability analysis" did not apply to Dollar General's liability.  Rather, Dollar General had a general duty to "put on a safe event" and act according to their published policies.  He contended that Perkins, a Dollar General manager, failed to act upon the information provided to Perkins by Spain and Mayfield that a potentially violent situation had arisen during the party it had sponsored.  In addition, Johnson contended that Dollar General negligently failed to enforce its promulgated "no weapons at company-sponsored events" policy.[7]

*Circuit Court's Ruling on Dollar General and Perkins's Motion for Summary Judgment*

¶34.   On April 10, 2023, the trial court found that in regard to premises liability, Johnson was a licensee.  However, the court found that Johnson had made no showing of Mayfield's propensity for violence or that Dollar General knew or should have known that Mayfield was engaging in conduct creating an unreasonable risk.  The court also found that no employee of Dollar General, including Perkins, had any actual or constructive knowledge of Mayfield's violent nature, nor did they have knowledge of an atmosphere of violence.  The court also held that Johnson's injury did not occur on a premises Dollar General controlled.  Thus, Dollar General was not liable for premises liability negligence.  The trial court also held that even if Dollar General had a common law duty to "put on a safe event," Dollar General did not breach that duty because the shooting occurred after Johnson had left Dollar General's

---

[7]   No written Dollar General policies were presented, only testimony that such policies existed.

16

party. Therefore, the court granted summary judgment in favor of Dollar General and Lawrence Perkins.

*Appeal*

¶35. Johnson appealed and argues that the circuit court erred in finding that Harlow's breached no duty of care to Johnson under the facts of this case. Johnson claims that Harlow's creation of security measures proved that Harlow's was aware of foreseeable acts of violence on its property. Johnson contends that he was not required to prove an "atmosphere of violence" existed because his claim was of simple negligence and not a premises liability claim. Moreover, Johnson argues Harlow's was on notice and had recognized long before the shooting that the implementation of security was necessary; thus, potential violence was foreseeable. Finally, Johnson also argues that he has a viable third-party beneficiary claim against Harlow's for its breach of the rental contract with Dollar General in which Harlow's agreed to provide adequate security.

¶36. Concerning Dollar General, Johnson argues on appeal that circuit court erred in finding that Dollar General did not breach any common law duty. Johnson contends that Dollar General had a duty to put on a safe event and that it knew that violence at a company-sponsored function was foreseeable when it created policies requiring employees to report potentially dangerous situations and prohibiting employees from bringing weapons.

**Standard of Review**

¶37. "We review an order granting summary judgment de novo." *Evans v. Shucker's Piano & Oyster Bar Inc.*, 281 So. 3d 302, 305 (¶12) (Miss. Ct. App. 2019). "[T]his Court's

review of the motion for summary judgment is just as if this Court were sitting as the circuit judge. No deference is given to the circuit court's decisions. This Court must look at the same pleadings and evidentiary material that the trial court considered." *Miss. Hub LLC v. Baldwin*, 358 So. 3d 305, 308 (¶7) (Miss. 2023). However, in determining whether a motion for summary judgment was properly granted, the evidence is viewed in the light most favorable to non-movant. *Clay v. Tunica County*, 385 So. 3d 1194, 1200-01 (¶20) (Miss. 2024). "Summary judgment is appropriate if from the pleadings, depositions, answers to interrogatories, admissions, and affidavits, there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Id.*; *accord* M.R.C.P. 56(c).

¶38. "A fact is neither material nor genuinely contested merely because one party proclaims it so." *Brown Lakeland Props. v. Renasant Bank,* 243 So. 3d 784, 790 (¶17) (Miss. Ct. App. 2018). The presence of fact issues in the record does not per se entitle a party to avoid summary judgment. *Evans*, 281 So. 3d at 306 (¶13). "The court must be convinced that the factual issue is a material one, one that matters in an outcome determinative sense. . . . [T]he existence of a hundred contested issues of fact will not thwart summary judgment where there is no genuine dispute regarding the material issues of fact." *Simmons v. Thompson Mach. of Miss. Inc.*, 631 So. 2d 798, 801 (Miss. 1994).

## Discussion

I.  **Whether the trial court erred by granting Harlow's motion for summary judgment.**

¶39. Johnson contends that the circuit court erred in applying premises liability precedent and finding that Harlow's owed no duty of care because there was an insufficient showing

of an atmosphere of violence. Johnson argues that instead his claim is one of simple negligence, i.e., that Harlow's had assumed a duty to care for its patrons in the parking lot by establishing security protocols and breached that duty.

¶40.    A landowner may be liable for an injury caused by the conditions and activities on their land. *Johnson v. Goodson,* 267 So. 3d 774, 777 (¶11) (Miss. 2019) (quoting *Doe v. Jameson Inn Inc.*, 56 So. 3d 549, 553 (¶11) (Miss. 2011)). "Premises liability is a theory of negligence that establishes the duty owed to someone injured on a landowner's premises as a result of 'conditions or activities' on the land." *Double Quick Inc. v. Moore*, 73 So. 3d 1162, 1165 (¶8) (Miss. 2011) (citing *Jameson Inn*, 56 So. 3d at 553 (¶11)). However, the Mississippi Supreme Court has refused on numerous occasions to "place upon a business a burden approaching strict liability for all injuries occurring on its premises." *Crain v. Cleveland Lodge 1532*, 641 So. 2d 1186, 1191 (Miss. 1994). In *Titus v. Williams*, 844 So. 2d 459, 467 (¶28) (Miss. 2003), the Supreme Court stated:

> Absent an exception, the analysis of premises liability involves three steps, described in *Little ex rel. Little v. Bell*, 719 So. 2d 757 (Miss. 1998).[8]  This procedure involves first determining the status of the injured person as either invitee, licensee, or trespasser. After this is done, the next step is to assess, based on the injured party's status, what duty the landowner/business operator owes to them. The last step is to determine whether the landowner/business operator breached the duty owed to the injured party. *Id*. at 760.

To recover damages in a premises liability action, a plaintiff must show (a) the duty owed by the landowner; (b) a breach of that duty; (c) damages; and (d) a causal connection between the breach and the damages. *Double Quick,* 73 So. 3d at 1166 (¶11).

---

[8] *Little* was overruled on other grounds by *Johnson v. Goodman*, 267 So. 3d 774, 777 n. 3 (Miss. 2019).

19

¶41.    The extent of the duty owed by a landowner depends on the status of the injured party. *Id.* at (¶12).  A plaintiff may be an invitee, a licensee, or a trespasser, and the duty of the landowner changes based on the plaintiff's status.  "A person is considered an invitee if they enter the premises of another in answer to the express or implied invitation of the owner or occupant for their mutual advantage."  *Titus*, 844 So. 2d at 467 (¶29) (citing *Gatewood v. Sampson*, 812 So. 2d 212, 220 (¶13) (Miss. 2002)).  The landowner's duty to invitees is to keep the premises reasonably safe.  *Id.*  "A licensee enters upon the property for his own convenience, or benefit pursuant to the license or implied permission of the owner."  *Id.* at (¶30).  A trespasser is one who enters on the property of another without any right, lawful authority, or express or implied invitation, permission, or license, but merely for his own purposes, pleasure, or convenience.  *Id.* at (¶31).  A landowner owes a licensee and a trespasser the same duty to refrain from wilfully or wantonly injuring him.  *Id.* at (¶32).

¶42.    With respect to invitees, when a premises is not reasonably safe, the landowner or business has a duty to warn where there is hidden danger or peril that is not in plain and open view.  *Id.* at (¶29) (quoting *Caruso v. Picayune Pizza Hut Inc.*, 598 So. 2d 770, 773 (Miss. 1992)).  The Supreme Court has held that the duty to invitees "extends to the parking lot around the building."  *Fenelon v. Jackson Metrocenter Mall Ltd.*, 172 So. 3d 760, 763 (¶11) (Miss. 2012).

¶43.    Johnson first argues that this is not a premises liability case and that the above analysis should not be applied.  He claims that this is a simple negligence case in which Harlow's assumed a duty to patrol the parking lot, and it failed to do so.  The Mississippi Supreme

20

Court rejected a similar argument in *Jameson Inn*, 56 So. 3d at 553(¶11), where a minor who left a movie theater and went to the hotel with several boys was raped. In the resulting lawsuit, the child's parents claimed that the action was one of simple negligence, as well as premises liability. *Id*. at (¶9). The Supreme Court noted that whether the child's cause of action falls under the general theory of negligence or a specific type of negligence (i.e., premises liability negligence) requires a review of the facts that gave rise to the claim. *Id*. at (¶10). The Supreme Court noted that because the rape took place on the premises and the parents alleged the child's injury resulted from the dangerous condition of the premises, the claim was properly considered under a premises liability analysis. *Id*. at (¶11). "Since premises liability is a theory of negligence that establishes the duty owed to someone injured on a landowner's premises as a result of 'conditions or activities' on the land, we find the trial court properly treated the Does' claim as one of pure premises liability." *Id*.

¶44.   In a case factually similar to the one at hand, the Supreme Court again rejected a plaintiff's argument that his case was one of simple negligence. There, customers at the Double Quick store started to fight outside the store. *Double Quick*, 73 So. 3d at 1164 (¶2). Mario Moore, who drove up during the altercation, intervened and tried to punch one of those involved, Ford. *Id*. Ford then retrieved a pistol, shot, and killed Mario. *Id*. Moore's estate sued Double Quick and argued that the case was one of simple negligence, not premises liability. *Id*. at 1165 (¶9). The trial court agreed and denied Double Quick's motion for summary judgment. *Id*. at (¶6). On interlocutory appeal, the Mississippi Supreme Court reversed the trial court. *Id*. at (¶10). Citing *Jameson Inn*, the Supreme Court stated, "[T]his

21

Court recently has reiterated that whether a cause of action falls under the general theory of negligence or a specific type of negligence warrants a review of the facts that gave rise to the claim." *Id*. (citing *Jameson Inn*, 56 So. 3d at 553 (¶10)). The Supreme Court determined:

> Mario was not injured by the Double Quick employees and the Double Quick employees were not even aware of his presence on the premises. Because Mario's injury was the result of an activity that occurred on Double Quick's property, we find that Moore's claim is one of premises liability.

¶45. Applying these precedents to this case, we find that the circuit court did not err in applying premises liability law to Johnson's facts. Johnson's injury resulted from activity on Harlow's property, which was not inflicted by any employee of Harlow's. As in *Double Quick*, Harlow's was not aware of the personal altercation between Johnson and Mayfield. Thus, Johnson's claim was one of premises-liability negligence.

¶46. Moving on to review the elements Johnson needed to prove to sustain a premises liability claim,[9] we note that the parties did not dispute, and the circuit court found, that Johnson was an invitee of Harlow's. Therefore, Harlow's had a duty to "exercise reasonable care to protect the invitee from reasonably foreseeable injuries at the hands of another." *Evans*, 281 So. 3d at 308 (¶21).

> Acts of third parties are reasonably foreseeable if the owner had cause to

---

[9] The Mississippi Landowners Protection Act, Miss. Code Ann. § 11-1-66.1 (Rev. 2019), sets forth strict requirements that a plaintiff must establish to prevail on a third-party premises-liability assault-based claim, and the law is inapplicable to this case because this lawsuit was filed prior to the Act's enactment in 2019, and the Act did not apply retroactively. In *Ruff v. Waffle House Inc.*, the United States District Court for the Northern District of Mississippi held that the Act should not apply to a case filed before the Act's passage because there was nothing within the Act indicating that it was to be applied retroactively. *Ruff v. Waffle House Inc.*, No. 1:19-CV-140-SA-DAS, 2021 WL 5368669, at *3 (N.D. Miss. Nov. 17, 2021). We agree.

22

anticipate such acts by either: (1) actual or constructive knowledge of the assailant's violent nature, or (2) actual or constructive knowledge that an atmosphere of violence exists on the premises.

*Ellis v. Gresham Serv. Stations Inc.*, 55 So. 3d 1123, 1127 (¶14) (Miss. Ct. App. 2011). Therefore, a landowner's liability involving a third-party assault on their premises hinges on the known propensity of the assailant or proof of an atmosphere of violence.

¶47. While knowledge of the assailant's criminal history is straightforward, an owner's knowledge of an atmosphere of violence depends on the overall pattern of criminal activity on the premises prior to the event in question. *Kroger Co. v. Knox*, 98 So. 3d 441, 443-44 (¶¶13-14) (Miss. 2012). In that case, Linda Knox, who was attacked and robbed in a Kroger parking lot, sued several defendants, including Kroger and the private company that provided security to Kroger, arguing that there should have been an armed guard in the parking lot. *Id.* at 442 (¶2). Kroger appealed the jury's verdict and argued that in the three years prior to the incident, there were only four criminal incidents: three purse snatchings and one stolen purse. *Id.* at 444 (¶16). On appeal, the Mississippi Supreme Court reversed, stating:

> We find as a matter of law that—in the context of Kroger's more than three million customer visits over the course of three years—four incidences of criminal activity are wholly insufficient to establish an atmosphere of violence on Kroger's parking lot. And imposing liability without notice of an atmosphere of violence would be nothing short of strict liability for injuries caused by the criminal activity of third parties.

*Id.*

¶48. This Court has also reviewed crime statistics to determine whether an atmosphere of violence existed at a location. In *Wright v. R.M. Smith Investments L.P.*, 210 So. 3d 555, 559 (¶14) (Miss. Ct. App. 2016), where Wright's purse was snatched in a parking lot, we held

that one violent incident on the premises in the span of five years did not create an atmosphere of violence, and even then, the prior incident (an armed robbery) was not similar to the incident at hand (a purse-snatching). In *Ellis*, 55 So. 3d at 1129 (¶24), we held that Ellis, who was attacked by a group outside of a gas station, failed to demonstrate an "overall pattern of criminal activity" when there were only twelve reported criminal acts on a store's property over a ten-year period. Overall, small numbers of dissimilar acts of violence stretching over multiple years generally does not establish an atmosphere of violence.

¶49. In the case at hand, Johnson presented no evidence showing or suggesting that Harlow's was aware of Mayfield's potential for violence. Thus Harlow's had no actual knowledge of Mayfield's alleged violent nature. Therefore, Johnson was obligated to present proof that an atmosphere of violence existed, placing Harlow's on notice of a need for heightened security measures. Although Johnson provided forty-three reports of incidents at the casino from the Washington County Sheriff's Department in the five years prior to the incident, only eight involved incidents in the parking lot, and only two of those involved a gun.[10] Neither resulted in an actual shooting in the parking lot. In the same time frame, Harlow's hosted well in excess of 2,718,273 patrons. With only two related incidents of violence occurring in a five-year span, the circuit court found that the evidence was insufficient to establish that it was aware of "an atmosphere of violence on the property."

---

[10] In her affidavit, Martin indicated in three years Harlow's had 2,718,273 casino patrons: 1,088,211 patrons from December 2012 through December 2013; 856,652 patrons from January 2014 through December 2014; and 773,410 patrons from January 2015 through December 2015. The crime statistics, however, covered five years prior to the incident.

24

We agree.

¶50.    Johnson contends that Harlow's security protocol of roving patrols was an admission that "violent acts committed in the casino's parking lots were foreseeable occurrences" and, accordingly, Harlow's "possessed actual knowledge that a foreseeable need for security existed on its premises," eliminating the need to prove an atmosphere of violence.  However, Johnson provides no authority or precedent that dispenses with the need to prove through a history of criminal activity on the premises that an atmosphere of violence did *in fact* exist.  Moreover, in *Landry v. Vallman McComb Mall LLC*, 369 So. 3d 616 (Miss. Ct. App. 2023), we stated that there is no Mississippi statute or jurisprudence in the premises liability context that finds a premises owner can be held liable simply by virtue of its violation of its own internal policy.  *Id.* at 622 (¶19).

¶51.    Johnson further claims that Harlow's temporary discontinuation of patrols at the time of the assault established Harlow's liability and cites *Gibson v. Wright*. 870 So. 2d 1250 (Miss. Ct. App. 2004).  However, that case is factually distinguishable and inapplicable to the case at hand. In *Gibson*, this Court affirmed the trial court's denial of a motion notwithstanding the verdict, stating that the plaintiff presented ample evidence establishing that the defendant laundromat owner had knowledge of an atmosphere of violence, which included evidence that the owner previously hired a security guard but later declined to extend its services.  *Id*. at 1257 (¶¶24-27).  However, the discontinuance of the security guard was just part of the proof the plaintiff presented to establish foreseeability.  In addition to formerly employing a security guard, Gibson entered evidence of a high crime rate in the

25

area, the security measures other businesses in the area had taken, and proof that a police officer had told the defendant to pursue extra security measures. *Id.* at (¶¶22-26).

¶52.    In *Stevens v. Tripplett*, 933 So. 2d 983 (Miss. Ct. App. 2005), we noted the substantial proof offered in *Gibson*.  In that case, Stevens, who was robbed at gunpoint while touring a home, cited *Gibson* while arguing that proof of damages and a police report showing a handful of crimes in the area over the last five years would be enough to prove his injury was reasonably foreseeable to the landowner.  *Id.* at 985-86 (¶10).  On appeal, we did not agree that *Gibson* applied because there was "significantly more evidence produced" in *Gibson*.  *Id*. at 986 (¶10).  Similarly, in the case at hand, *Gibson* is inapplicable because the injured party there put on significantly more proof than Johnson did here.

¶53.    In summary, based on the facts of the case, premises liability negligence is Johnson's only theory of recovery.  Because Johnson was an invitee, Harlow's duty was to exercise reasonable care to protect him from reasonably foreseeable injuries at the hands of another.  To establish the extent of Harlow's knowledge that the assault was reasonably foreseeable, Johnson needed to prove that either Harlow's knew or should have known of Mayfield's violent nature or that Harlow's had knowledge that an atmosphere of violence existed on the premises.  Johnson presented no evidence that Harlow's knew or should have known that Mayfield was a violent person, and the history of crime on the premises did not establish that an atmosphere of violence existed.  Harlow's brief reassignment of the parking lot patrol was not unreasonable given the amount of prior reported crime in the parking lot.  Accordingly, we find no error by the trial judge in granting summary judgment as to Johnson's claim

against Harlow's.[11]

### II. Whether the trial court erred by granting Dollar General and Lawrence Perkins's joint motion for summary judgment.

¶54. On appeal, Johnson argues that the circuit court erred in finding that Dollar General did not breach a common law duty to "host a safe event." The circuit court engaged in both a premises liability and a common law negligence analysis of Johnson's claim against Dollar General, finding Dollar General not liable under either. On appeal, both parties agree that because Dollar General did not own or control the physical premises at Harlow's, Dollar General cannot be held to the premises liability standard of negligence. However, Johnson argues that summary judgment was precluded in a simple negligence analysis because, on the facts, a reasonable juror could find that Dollar General or Perkins, individually, was negligent.

¶55. "To succeed on a negligence claim, a plaintiff must prove the following by a preponderance of the evidence: duty, breach of duty, causation, and injury." *Brooks v. Jeffreys*, 368 So. 3d 356, 361 (¶12) (Miss. Ct. App. 2023) (citing *Patterson v. Liberty Assocs. L.P.*, 910 So. 2d 1014, 1019 (¶14) (Miss. 2004)).

> The plaintiff must show (1) the existence of a duty to conform to a specific standard of conduct for the protection of others against the unreasonable risk of injury, (2) a breach of that duty, (3) causal relationship between the breach and alleged injury, and (4) injury or damages.

---

[11] Johnson also argues he was a third-party beneficiary of Dollar General's rental contract with Harlow's. However, Johnson provides no legal authority on this issue. Because issues not supported by relevant authority are procedurally barred from appellate review, we decline to address this issue on appeal. *Reading v. Reading*, 350 So. 3d 1195, 1200 (¶22) (Miss. Ct. App. 2022); *accord* M.R.A.P. 28(a)(7).

*Brooks*, 368 So. 3d at 361 (¶12) (internal quotation marks and citations omitted).

¶56. "Tort duties are a question of law for the Court and 'generally are imposed as a matter of public policy.'" *City of Picayune v. Landry Lewis Germany Architects P.A.*, 381 So. 3d 1103, 1107 (¶15) (Miss. 2024) (quoting *Samson v. Unum Life Ins. Co. of Am.*, 300 So. 3d 930, 938 n.11 (Miss. 2020)). For example, in *Donald v. Amoco Production Co.*, 735 So. 2d 161, 175 (¶49) (Miss. 1999), the Mississippi Supreme Court determined that an oil company had a duty to ensure the safe disposal of its waste. *See also Brooks*, 368 So. 3d at 362 (¶14) (holding cleaning company owed homeowner a duty not to create a dangerous or hazardous condition, like a wet floor, or to warn homeowner of the condition).

¶57. There is a general duty to act as a reasonable and prudent person would act under the same or similar circumstances. *Doe ex rel. Doe v. Wright Sec. Servs. Inc.*, 950 So. 2d 1076, 1079 (¶12) (Miss. Ct. App. 2007) (citing *Donald v. Amoco Prod. Co.*, 735 So. 2d 161, 175 (¶48) (Miss.1999)). Although whether a duty exists is a question of law, an "important component of the existence of the duty is that the injury is 'reasonably foreseeable.'" *Rein v. Benchmark Const. Co.*, 865 So. 2d 1134, 1143 (¶29) (Miss. 2004). The Mississippi Supreme Court has held that "there is no duty to protect against an unforeseeable harm and, therefore, no negligence in failing to do so." *Rhaly v. Waste Mgmt. of Miss. Inc.*, 43 So. 3d 509, 513 (¶11) (Miss. Ct. App. 2010). "Foreseeability is an essential element of both duty and causation." *Id.* (citing *Patterson*, 910 So. 2d at 1019 (¶14)).

*Dollar General's Liability*

¶58. In the case at hand, Johnson argues that Dollar General had a duty to "host a safe

28

event" after hours and off-site, springing from its workplace policies of reporting altercations among employees and a "no weapons" policy. The Mississippi Supreme Court has held that an employer owes its employees the nondelegable duty to provide its employees with a safe place to work. *Green v. Allendale Planting Co.*, 954 So. 2d 1032, 1037 (¶12) (Miss. 2007). However, there is no reported case where this duty has been extended to a non-mandatory social event hosted by an employer at another location. Even if it did, Johnson needed to show that the actions of Dollar General or its employees created an unsafe work space. *Id.* at 1038 (¶13). In this case, the unsafe space, if any, was the parking lot which Dollar General had no control over.

¶59.     Under Mississippi law, employers have no duty to supervise employees that are off-duty or not working. *Baker Donelson Bearman Caldwell & Berkowitz P.C. v. Seay*, 42 So. 3d 474, 489 (¶45) (Miss. 2010). Although Dollar General had a no-weapons-at-work policy that their corporate representative admitted extended to a social event like the holiday party, Dollar General had no notice that Mayfield had a weapon. There was no proof that employees had brought weapons to social events in the past that might prompt Dollar General to screen guests upon entrance. In addition, Mayfield was obviously not acting in the scope of his employment at the time of the altercation and shooting in the parking lot, so Dollar General is not vicariously liable for Mayfield's actions. *Morgan v. MML Invs. Servs. Inc.*, 226 So. 3d 590, 595 (¶16) (Miss. Ct. App. 2017) (Where an employee acts for a purpose of his own and not in service of his employer's interest, the employer cannot be held liable under the doctrine of respondeat superior.). Finally, if Dollar General had any duty to

Johnson, it ended when Johnson left the party. Dollar General had no control over the parking lot and no obligation to provide any security there.

*Perkins's Liability*

¶60. Johnson also argues that Perkins was individually negligent because he failed to report angry words or threats of violence to his superiors as required by another Dollar General workplace policy. However, Perkins had attended the party as a guest; he was not working or acting in his capacity as a manager. Moreover, Perkins testified he had a passing conversation with Spain and Mayfield in the restroom, which hardly qualifies as a report of a threatening situation that demanded his attention. Johnson points to Dollar General's answers to interrogatories, which stated that Perkins recalled encountering Mayfield in the restroom and that "he (Perkins) heard Mayfield talking about being concerned with Johnson after Johnson threatened Mayfield and his cousin Roderick Spain." However, in his deposition, Perkins testified Mayfield merely said that because some "old boy" was tripping, he (Mayfield) was leaving the party. Perkins understood this to mean that someone was maybe looking or acting crazy and that Mayfield was leaving because he didn't want a problem. Perkins said that Mayfield was not angry or hostile. Perkins was emphatic that Mayfield did not say anything about being threatened.

¶61. Even if Mayfield had reported that he was threatened, Mayfield undisputably left the party, thereby resolving the threatening situation. Moreover, applying Johnson's logic, Perkins would have had a duty to Mayfield, the allegedly threatened individual, not Johnson. There was no proof that Perkins knew that Johnson was the "tripping" individual or that

Johnson, too, had left the building. Accordingly, Perkins had no reason to believe that Mayfield was subject to harm or that anything else would happen at Dollar General's party. Certainly there was no proof that Perkins should have foreseen that Johnson, a guest Perkins did not know, would be shot outside.

¶62. Because the injury to Johnson was not reasonably foreseeable by Dollar General or Perkins in these circumstances, we affirm the circuit court's holding that neither breached any duty and that both were entitled to summary judgment.

## Conclusion

¶63. Because Johnson failed to show an atmosphere of violence at Harlow's, we find that Harlow's did not breach any duty owed to Johnson, and the trial court did not err in granting summary judgment in Harlow's favor. Moreover, because neither Dollar General nor Perkins breached any duty owed to Johnson for the unforeseen shooting, we affirm the trial court's grant of summary judgment in their favor as well.

¶64. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WEDDLE, J., NOT PARTICIPATING.**